JURY TRIAL DEMANDED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------

| | |
|---|---|
| Randall S. Goulding, ) | |
|    Plaintiff ) | |
| ) | |
| -vs.- ) | |
| ) | |
| LESLIE J. WEISS, BARNES & THORNBURG, LLP, ) | **COMPLAINT** |
| THE NUTMEG GROUP, LLC, ) | **1:15-cv-4693** |
| NUTMEG/MERCURY FUND, LLLP, ) | |
| NUTMEG/TROPICAL FUND, ) | [Related Case: |
| LP, NUTMEG/FORTUNA FUND, LLLP, ) | Case No. 12-cv-07373 |
| NUTMEG/MINIFUND, LLLP, NUTMEG/MINIFUND ) | District Judge Lefkow |
| II, LLLP, NUTMEG/NANOBAC FUND, LP, ) | Magistrate Judge Finnegan] |
| NUTMEG/ PATRIOT FUND, LLLP, ) | |
| NUTMEG/OCTOBER 2005 FUND, LLLP, ) | |
| NUTMEG/MICHAEL FUND, LP, ) | |
| NUTMEG/ADZONE FUND, LP, ) | |
| NUTMEG/STARTECH II, LP, ) | |
| NUTMEG/LIGHTNING FUND I, LLLP and ) | |
| NUTMEG/IMAGE GLOBE, LP, ) | |
|    Defendants. ) | |
| ) | |
| ) | |
| ------------------------------------------------- ) | |

Plaintiff, Randall S. Goulding ("Plaintiff"), pro se, for his complaint, alleges:

## I.  Parties

### A.  Plaintiff

1.      Plaintiff, Randall S. Goulding, is a resident of Illinois and a member and

manager of The Nutmeg Group, LLC ("Nutmeg"), which is in turn a general partner and a

limited partner in each of the following investment pools/limited partnerships: Nutmeg/Mercury Fund, LLLP ("Mercury Fund"), Nutmeg/Tropical Fund, LP ("Tropical Fund"), Nutmeg/Fortuna Fund, LLLP ("Fortuna Fund"), Nutmeg/MiniFund, LLLP ("MiniFund"), Nutmeg/MiniFund II, LLLP ("MiniFund II"), Nutmeg/Nanobac Fund, LP ("Nanobac Fund"), Nutmeg/Patriot Fund, LLLP ("Patriot Fund"), Nutmeg/October 2005 Fund, LLLP ("October 2005 Fund"), Nutmeg/Michael Fund, LP ("Michael Fund"), Nutmeg Adzone Fund, LP ("Adzone Fund") and Nutmeg Startech II, LP ("Star Tech"), Nutmeg/Lightning Fund I, LLLP ("Lightning Fund I") and Nutmeg/Image Globe ("Image, LP").  (Hereinafter, these investment pools will be referred to collectively, as "the Nutmeg Funds" or "the Funds.")   Each pool was formed as a limited partnership under the law of either Illinois or Minnesota.

2.      Plaintiff is prosecuting this action on his own behalf and derivatively on behalf of Nutmeg and on behalf of each of the Nutmeg Funds.

3.      As of March 31, 2009, the value of Plaintiff's claim for out-of-pocket expenses from Nutmeg was 1,871,990.53.

4.      As of December 31, 2008 and as of March 31, 2009, the value of Plaintiff's claim for accumulated but unpaid carried interest was $493,641.

5.      As of December 31, 2008, the following amount was the value of Plaintiff's interest relative to his investment in:

a.   Mercury Fund was $64,309;
b.   Tropical Fund was $62,874;
c.   Fortuna Fund was $122,433;
d.   MiniFund was $13,428;
e.   MiniFund II was $56,768;
f.   Nanobac Fund was $40,959;
g.   Patriot Fund was $91,648;
h.   October 2005 Fund was $105,510;
i.   Michael Fund was $153,017;
j.   Adzone Fund was $14,996;
k.   Star Tech was $53,187;
l.   Lightning Fund I was $81,206;
m.   Image, LP was $26,669.

## B. Defendants

6.   Defendant Leslie Weiss is an attorney whose office is at One North Wacker Drive, Chicago, Illinois 60606. Weiss is a partner in defendant Barnes & Thornburg, LLP.

7.   Defendant Barnes & Thornburg, LLP is a law firm and a professional limited liability partnership with a place of business at One North Wacker Drive, Chicago, Illinois 60606.

8.   Defendant The Nutmeg Group, LLC (hereinafter, Nutmeg) is a limited liability company with a place of business: c/o Leslie Weiss, One North Wacker Drive, Chicago, Illinois 60606.

9.   Defendants Mercury Fund, LLLP, Tropical Fund, LP, Fortuna Fund, LLLP, MiniFund, LLLP, MiniFund II, LLLP, Nanobac Fund, LP, Patriot Fund, LLLP, October 2005 Fund, LLLP, Michael Fund, LLLP, Adzone Fund, LP and Startech II, LP, Lightning Fund I,

LLLP and Image Globe, LP ("the Funds," as defined above) are defendants whose

presence in this action may be necessary for the Court to order all the relief requested

herein.   The Funds each have a place of business c/o Leslie Weiss, One Wacker Drive,

Chicago, Illinois  60606.

## II. Jurisdiction and Venue

10.     This Court has *in personam* jurisdiction over defendants because they each

reside within and/or have a principal place of business within the State of Illinois.

11.     Plaintiff's claims against Weiss in this case are within this Court's ancillary

jurisdiction, as defined in 28 U.S.C. §1367(a), based on the order in a case pending in this

District, *i.e., Securities and Exchange Commission v. The Nutmeg Group, LLC, et ano.*, 09

Civ 01775 (SJC) (JTG), which appointed Weiss as receiver of the property belonging to the

limited partnerships in which plaintiff is an investor and upon the original jurisdiction of

this court as provided in 28 U.S.C. §754.  All of plaintiff's claims arise out of, and relate to,

Weiss' receivership.

12.     Plaintiff's claims against Barnes & Thornburg in this case are within this

Court's ancillary jurisdiction, as defined in 28 U.S.C §1367(a), based on the existence

within this District of the *SEC v. Nutmeg* case in which Barnes & Thornburg was

appointed as attorneys for Weiss in her capacity as receiver.  These claims are also within

this Court's pendent party jurisdiction, as defined in 28 U.S.C. §1367(a), since they arise

out of a common nucleus of operative fact as the claims against Weiss.

13.     Venue is proper under 28 U.S.C. §1391(a)(1) in this District since all

defendants have their residences and/or principal places of business here and §1391(a)(2)

since a substantial part of the events giving rise to the claims herein occurred within this

District.

## III. Demand

14.     Those claims that plaintiff is asserting derivatively on behalf of the Funds

allege that Nutmeg, Weiss, as Receiver of Nutmeg, and Barnes & Thornburg, as the

attorneys for Weiss and Nutmeg, intentionally breached fiduciary duties, committed

legal malpractice, were reckless and grossly negligent and intentionally, recklessly or

with gross negligence, disregarded their fiduciary duties of care and the best interests

of the Funds from the period spanning August 6, 2009 to the present.  On October 4,

2011, many of the plaintiffs in Related Case No. 12-cv-07373 (District Judge Lefkow,

Magistrate Judge Finnegan), demanded that Weiss cause the Funds to prosecute the

derivative claims set forth herein in Counts I-XVII and Count XX.  Weiss declined to do

so and, in fact, on October 13, 2011 Weiss moved to enjoin the plaintiffs in Case No.

12-cv-07373 from bringing any such action.  Thereafter, Weiss demanded that plaintiffs

obtain a ruling from the court in *Securities & Exchange Commission v. The Nutmeg*

*Group, LLC*, Civil Action No. 09-civ-1775 permitting before bringing the action.  On

August 13, 2012, the court in the *SEC v. Nutmeg* case issued a declaratory ruling permitting this action to proceed. Any demand that Weiss cause the Funds to directly prosecute the claims would be futile since an identity of interest exists between the party which has unilateral control over the Funds decision whether or not to directly prosecute those claims (Weiss) and the defendants against whom those claims would be filed (Weiss and Barnes & Thornburg).

## IV. <u>The Nature of this Action</u>

15.     This lawsuit is against Leslie Weiss, Esq., the Court-appointed receiver for Nutmeg Group, LLC (sometimes, "Nutmeg"), Ms. Weiss' law firm, Barnes & Thornburg, LLP and Nutmeg. The suit includes both direct claims by the Plaintiff and derivative claims on behalf of the Funds.

16.     In October 2011, Plaintiff engaged the services of Ms. Weiss in an unrelated matter. Plaintiff did not execute any agreement waiving conflicts that Ms. Weiss may have in assuming the role of receiver in the Nutmeg matter.

17.     Each of the Funds is an investment pool which is exempt from registration as an investment company under section 3(c)(1) of the federal Investment Company Act of 1940. Each of the Funds was formed under the limited partnership statute of either Illinois or Minnesota. Until early 2009, the Funds were managed by Nutmeg, the sole general partner of each. Plaintiff, a Lake County, Illinois resident, was the managing

member of Nutmeg. Nutmeg also entered into written advisory agreements with each of the Funds. For each Fund, the most recent advisory agreement with Nutmeg was signed on November 21, 2008 (hereinafter, "the Advisory Agreements").

18. On March 23, 2009, Nutmeg was sued by the Securities & Exchange Commission in an action entitled *Securities & Exchange Commission v. Nutmeg Group, LLC, et al.*, Civil Action No. 09-CV-1775 ("the *SEC v. Nutmeg* action") which was assigned to the late Hon. William Hibbler, U.S.D.J. At the commencement of the action, the SEC obtained a TRO which prohibited Nutmeg and Plaintiff in from managing the Funds. When it became clear the Funds had to be actively managed, the SEC moved for the appointment of a receiver to assume authority over the Funds, the SEC filed a motion to appoint Weiss as receiver, and Judge Hibbler granted that motion, appointing Weiss as receiver on August 6, 2009.

19. Under the relevant Illinois and Minnesota limited partnership acts, the Court order placing Nutmeg in receivership rendered Nutmeg "disassociated" from the Funds. The disassociation of Nutmeg as general partner of each fund, in turn, triggered the limited partners' statutory right to select a new general partner for the respective Funds to replace Nutmeg (and further provided that if a new general partner was not selected, the Funds would "non-judicially" dissolve by operation of law). The limited partnership law of both Illinois and Minnesota imposed upon Weiss the obligation to

apprise the limited partners of these effects of the receivership order and their resulting right to select a new general partner. However, Weiss did not apprise the limited partners of their rights to select a new general partner for each fund and instead unilaterally retained sole authority over the Funds in direct contravention of the Illinois and Minnesota limited partnership statutes.

20. The receivership order specifically prohibited Weiss from unilaterally deciding to liquidate the Funds. Weiss was therefore required to treat the Funds as the going concerns they, in fact, were.

21. Beyond being legally prohibited under state limited partnership law from retaining authority to operate the Funds herself, Weiss was decidedly unqualified for that task. The Funds largely held assets known as "PIPES" -- "private investment in public equity." Managing PIPE assets requires substantial background and experience. Weiss was not herself any kind of investment advisor, registered or unregistered, and had no personal background -- let alone any professional training -- in asset management. Therefore, her fiduciary obligation to the Funds required her to ensure that the requisite professional advisory assistance was obtained. Weiss thus not only concealed from the limited partners their right to select a new general partner, but also failed to comply with the provision in the receivership order that authorized the selection of a qualified substitute general partner or investment advisor "as required." Instead, Weiss retained

operational authority for herself and, thereafter, caused a dramatic diminution of the

Funds' assets and allowed loss upon loss of opportunities for substantial profits that a

qualified investment advisor or funds manager would have routinely taken advantage of.

The diminution of assets and lost opportunities resulted in tens of millions of dollars of

damages to the Funds.

22.     [*The following allegation relates to a dismissed claim in Related Case No. 12-cv-07373, but is set forth herein for the sake of convenience and in order to avoid the risk of waiving rights on appeal*]
Weiss has directly violated and caused Nutmeg to violate §206(a)(4) of the Investment

Advisors Act and SEC Rule 206(4)-2 by failing either to cause Nutmeg to distribute

quarterly account statements to the limited partners in the Funds or to ensure that the

qualified custodians distributed quarterly account statements to the limited partners.

23.     Weiss and Barnes & Thornburg have also committed legal malpractice,

including multiple failures to attend court appearances in several suits prosecuted by, or

on behalf of, the Funds, and in which Weiss caused Barnes & Thornburg to appear as

substitute counsel on behalf of the various Funds. These missed court appearances have

resulted in dismissals of meritorious and valuable claims.  Weiss has also paid an

accounting firm, Crowe Horwath, $193,234.10 over and above a $150,000 fee cap without

obtaining court approval even though Judge Hibbler *specifically* directed Crowe Horwath

to submit a fee estimate for any work beyond the $150,000 cap which he could then

either approve or disapprove before the payment of any compensation to the firm.  Most

significantly, Weiss irrationally and without any coherent explanation terminated a transaction in which an investment vehicle largely owned by Nutmeg and the Funds would have been taken public, an event that would have resulted in substantial profits for the Funds. Weiss terminated this transaction even though there was no downside to the transaction or alternative use for the investment vehicle, thus assuring that the Funds would get nothing instead of something very substantial.

24. In addition to the instances of malpractice, Barnes & Thornburg has also aided and abetted and participated in Weiss' breach of her fiduciary duties. As alleged herein, Barnes & Thornburg is further liable for Weiss' conduct on the grounds of "*respondeat superior*," an agency concept which holds an employer (or other principal) responsible for the acts of its employees and agents. Each of Weiss' acts was undertaken as a Barnes & Thornburg attorney, most if not all of her correspondence was transmitted under Barnes & Thornburg letterhead and her time was billed by and through Barnes & Thornburg.

25. Recently, Ms. Weiss has communicated with investors and stated that there only a few thousand dollars remain -- essentially nothing -- remaining of fund assets to be distributed to investors. At this point in time, approximately $545,000.00 has been paid to Weiss and Barnes & Thornburg and an additional $100,000 is been paid to her legal defense regarding lawsuits filed against Weiss and Barnes & Thornburg. As noted,

Weiss has also caused a total of $343,234.10 to be paid to Crowe Horwath, $193,234.10

in excess of the court-imposed $150,000 fee cap. Weiss has caused these excess

payments to Crowe Horwath without disclosing to the Court that, in entirely unrelated

matters, Barnes & Thornburg has used Crowe Horwath as its own accounting firm and

that Barnes & Thornburg and Crowe Horwath have a long-standing relationship which

includes their co-sponsoring numerous civic and charitable activities throughout the

state of Indiana. Notably, at least a significant portion of the money paid to Weiss,

Barnes & Thornburg or Crowe Horwath came from the proceeds of the sale of assets

belonging to the Funds.

26.     Nutmeg's own valuation of the Fund assets was approximately $13,300,000

as of March 31, 2009, shortly after the SEC commenced its action in 2009, based on the

use of Financial Accounting Standard 157 a "mark-to-market" formula which uses a non-

discounted stock price in valuing derivative securities -- and was the customary valuation

method in the securities industry at that time -- the value of the funds was approximately

$14,000,000 as of March 31, 2009. Crowe Horwath has disputed Nutmeg's valuation

method, and discounted certain assets by more than 50 percent from the mark-to-

market value. However, even the Crowe Horwath approach – which entirely ignores FAS

157 – discounting from a mark-to-market computation – appears to indicate that the

combined value of the funds was at least $6,000,000, an amount far greater than the few

thousand dollars Weiss has indicated might, at least one time, be available for

distribution to the limited partners.

## IV. Facts Relevant to All Claims

### A. Nutmeg and the Nature of the PIPE Investments It Typically Made on Behalf of the Funds

27.      Nutmeg was established in 2003 and filed its application to become a

registered investment advisor, in 2007. The SEC accepted the application in June 2007.

Nutmeg remained a registered investment advisor until late 2009, when Weiss caused it

to be deregistered. At the beginning of 2009, Nutmeg was acting as a general partner

and investment manager to 16 different "investment companies," including the Funds

involved in this case.  Initially, the limited partners in the Funds consisted largely of

Plaintiff's friends and family members. Gradually, the number of investors/limited

partners grew, with most participating in multiple Funds. At the beginning of 2009, there

were more than 300 limited partners in the Funds, including those that joined as plaintiffs

in Related Case No. 12-cv-07373.

28.      As noted, the Funds principally engaged in a transactions involving

"private investments in public equity" or PIPEs. Often, a PIPE involves the public

company issuing what is called a "convertible debenture" in consideration for funding. A

convertible debenture can be "converted" to stock in the public company according to a

contractually specified formula. The conversion formula can either be fixed or, as is far

more frequent, vary with the trading price of the public company's stock. Debentures

with such variable formulas are called "floating convertible debentures." Most of the

assets held by the Nutmeg Funds were floating convertible debentures. The conversion

formula used for floating convertible debentures typically utilize the issuer's stock prices

during a preceding "look back" period. Under the terms of the floating convertible

debentures held by the Nutmeg Funds, the average prices obtained from the "look

back" were substantially discounted by amounts of 30 to 60 percent, so that when the

Fund converted a portion of the debt it was holding it would be entitled to receive stock

with a far greater value than the amount of debt converted, plus accrued interest.

29.     For example, if the average price obtained from the look back period was

$.05 per share and the discount was 40 percent, the effective "conversion price" used to

calculate the amount of stock the Fund would receive would be $.03 per share,

representing a $.02 per share discount. In this example, if $6000 of debt was converted,

because of the discount, the Fund would receive 200,000 shares ($6000/.03). Had a non-

discounted price been used, the Fund would have received only 120,000 shares

($6000/.05). In other words, profit is generated by converting a portion of the debt to

stock in the portfolio company, and then selling the stock to capture the difference

between (a) the discount price used in the conversion calculation and (b) the market

price at the time of the sale. Additionally, a PIPE asset manager will typically issue

conversion notices when the stock price is trending upwards, so that the additional

profit (beyond the discount) can be captured when the stock is sold after a price

increase, with the conversion calculation preceding such price increase.

30.     Even in a flat or downward trending market, profit can be achieved so long

as the trading price of the stock does not decline to the extent of eclipsing the

discounted price used in the conversion formula.

31.     Operating a fund which is invested in PIPE assets requires active, diligent

monitoring of the price and volume trends of the stock of the portfolio companies,

timely exercise of conversion rights and, thereafter, careful -- *i.e.*, in a fashion that does

not significantly depress the price -- sale of the stock. Managing PIPE assets also often

requires renegotiating the terms of the debentures when the issuer fails to honor a

conversion notice and is not capable of paying off the debt in cash.

32.     As detailed below, either Weiss was incapable of operating funds which

were largely invested in PIPE assets or simply did not want to do so. For example, while

conversions are an integral part of managing pipe assets, in the two years following

Weiss' appointment as receiver, she appears to have converted a portion of a debenture

on no more than two occasions. On each occasion that she actually made a conversion,

it was only at the adamant insistence of Plaintiff. Inexplicably, while that conversion was

extraordinarily profitable (resulting in $119,239.63 in stock sales following the

conversion of a $10,000 portion, without accumulated interest, of a $50,000 debt,

exclusive of interest), Weiss failed to convert any more of that debt even though the

market conditions for doing so became significantly better than they had been when

she had converted the $10,000 portion into stock, and sold such stock for $119,239.63.

Prior to Weiss' appointment, Nutmeg would typically issue conversion notices an

average of six times per month.

**B. The Manner in Which Nutmeg Operated its Business**

33.     Nutmeg had a strategy of converting the debentures and selling the

resulting stock at a relatively patient pace (in contrast to some PIPE managers, who

routinely convert the maximum amount that they believe the market can absorb within

a day or two and immediately liquidate the entire amount converted), often

renegotiating terms of the debentures and waiting for periods of substantial volume

and/or rising prices to convert and sell.  This strategy would have been continued to be

highly successful had it been continued following the receivership (either by a new

general partner chosen by the limited partners in accordance with state law, or a new

investment advisor hired pursuant to the receivership order).

**C. The *SEC v. Nutmeg* Action**

34.     The still ongoing *SEC v. Nutmeg* action was commenced on March 23,

2009. The SEC's complaint sought two principal forms of relief: (1) orders requiring

Nutmeg to comply with various legal requirements and regulations relating to records keeping, segregation of accounts and reporting the value of investor positions and (2) orders requiring Nutmeg, Plaintiff and other "relief defendants" to disgorge certain unspecified allegedly excessive compensation and improper distributions (sometimes, "the disgorgement claims"). Nutmeg and Plaintiff denied both sets of allegations.

35.     When the action was commenced, the SEC moved to enjoin Plaintiff and Nutmeg from operating the Funds. On March 24, 2009, Judge Hibbler entered a temporary restraining order which froze Nutmeg's accounts and enjoined Nutmeg and Plaintiff from operating or managing the Funds. (Hereinafter, this TRO will sometimes be referred to as "the freeze order.")

**D. <u>The Difficulties Imposed by the Freeze Order</u>**

36.     The freeze order was continued by consent for several months. This meant that Judge Hibbler's approval would be required for every transaction involving any of the Funds. At first, several transactions were implemented with Judge Hibbler's approval. However, involving the Court in every transaction was of course impractical.

37.     Therefore, the SEC moved for the appointment of a receiver. The SEC selected Weiss and Nutmeg did not oppose. Her appointment was entered by the Court on August 6, 2009.

**E. <u>The Order Appointing Weiss</u>**

38.     The order appointing Weiss did not establish a liquidating receivership. To the contrary, the order expressly anticipated that Funds would continue to operate and to permit them to do so, authorized Weiss to appoint "substitute advisers or general partners for the Funds[.]"   The order thus contemplated that operating the Funds could require the assistance of an investment professional who was knowledgeable about the management of PIPE assets.

39.     Also, the order did not give Weiss authority to unilaterally determine whether Nutmeg and the Funds should continue its business.  Instead, it provided that a decision to liquidate the Funds would require advance approval by the Court.

## F.  Weiss' Failure to Cause Quarterly Account Statements to Be Distributed to the Limited Partners

40.     [*The following allegation relates to a dismissed claim in Related Case No. 12-cv-07373, but is set forth herein for the sake of convenience and in order to avoid the risk of waiving rights to appeal*] In violation of  §206(a)(4) of the Investment Advisors Act and SEC Rule 206(4)-2, Weiss has never distributed quarterly account statements to the limited partners and has never caused any qualified custodian to distribute quarterly account statements to the limited partners.

## G. Weiss' Violation of the Limited Partners Rights to Elect a New General Partner of Each Fund

41.     Following her appointment as general partner and receiver Weiss directly

violated the limited partners' rights under state law.

42.     Each of the Funds is either an Illinois or a Minnesota limited partnership.

Both Illinois and Minnesota have adopted the Uniform Limited Partnership act, and the

limited partnership law of both states is identical as it relates to this case. Under the

Uniform Act, when a limited partnership's general partner is put into receivership, the

general partner is automatically deemed "disassociated from the partnership" unless the

receivership order is vacated within 90 days. 805 ILCS 215/603(c) and (d); Minn. Stat.

§§321.0603 (C) and (D).

43.     In both Illinois and Minnesota, for limited partnerships which have only

one general partner, the disassociation of that sole general partner would result in the

non-judicial dissolution of the partnership as a matter of law unless a "majority of the

rights" -- *i.e.*, a majority of the limited partnership interests -- "consent" to the

"admission" of a new general partner within a 90-day period.  805 ILCS 215/801(b)(i) and

(ii); Minn. Stat. §§321.0801(B)(i) and(ii).

44.     On behalf of each of the Funds, Weiss was under an absolute obligation to

notify the limited partners in each Fund: (i) that her appointment as the Nutmeg receiver

resulted in the "disassociation" of Nutmeg as general partner of each respective fund, (ii)

that, as a result of the disassociation of Nutmeg, they were entitled to select a new,

replacement, general partner based on the consent of the majority of interests in each

Fund and (iii) that, if they did not do so, each Fund would be otherwise dissolved as a matter of law. Weiss' duty to notify the limited partners of the effect of the receivership and their resulting right to select a new general partner is beyond dispute. In both Illinois and Minnesota, the limited partnership statute provides that: "Whenever this chapter or a partnership agreement *provides for a limited partner to give or withhold consent to a matter, before the consent is given or withheld, the limited partnership shall, without demand, provide the limited partner with all information material to the limited partner's decision* that the limited partnership knows." 805 ILCS 215/304(1); Minn. Stat. §321.0304(1) (emphasis added).

45.     Weiss directly and intentionally violated the rights of the limited partners under the Illinois and Minnesota statutes by failing to provide the information which was necessary for them to choose a new general partner for each Fund and, instead, retaining the responsibilities of general partner for herself.

46.     Weiss' failure to disclose to the limited partners that they had a right to select and admit a new general partner also violated the order appointing her since that order authorized the retention of a "substitute general partner" as "required."

**H. The Items of Business which Plaintiff Presented**
**To Weiss at the Outset of the Receivership**

47.     In July 2009, after Weiss' selection as receiver, Plaintiff sent her a list of more than 20 items of business he believed that Weiss needed to address promptly. The

list read, in part:

6) Niveous Intellimedia Technology, Inc.'s shares (NIV) - sell shares for Mercury Fund. There is no reason for Mercury not to sell the shares that it currently has. Pursuant to the leak out provision, only 1/12 of which can be sold per month. * * * We were first able to sell on June 13, 2009. There are 2 months (1/6) at this point that we could sell. Niveous ($250,000.00 Common Stock investment, priced at $1.80/share for a total of 138,889 shares).

7) Secure Financial (SFNL)-transfer and sell shares for Patriot Fund - Secure Financial shares should be sold [footnote omitted] * * * There is no reason for Patriot Fund not to sell the shares that it currently has. [Also], the shares were issued in the name of Nutmeg but should have been issued in the name of the Patriot Fund. Accordingly, they should be transferred. The broker said that as long as it's in a court order that he would transfer the shares to a Patriot account.

8) Suit against Jack Freedman* * * We would like approval to settle the case against Jack Freedman which has been filed and is currently pending. The settlement with Jack Freedman involves the issuance of restricted shares of Green Planet Inc. (GNPG) and the participation in his sales of Sponge-tech (SPNG) stock. To settle our differences, we agreed that Jack Freedman (a non-affiliate) would sell 1,000,000 shares of SPNG (now at 12.9 cents), which he currently holds, on the open market within the next 30 days and give Mercury 30% of the proceeds. We also agreed he'd transfer to Mercury Fund, 500,000 restricted shares of Green Planet Inc. (now at 7 cents) which are eligible for free-trading status within 90 days, under rule 144.

* * *

9) Renegotiate with North Bay Resources, Inc. (NBRI) - We would like approval to renegotiate the $60K note for new free-trading shares to Mercury Fund. I think I could probably get 2,500,000 free-trading shares which we could net about $40,000.

10) Renegotiate with GoIP Global, Inc. (GOIG) - We would like approval to renegotiate the $50K note for new free-trading shares to Mercury Fund. We should renegotiate the $50,000 so as get some current liquidity for Mercury.

11) Renegotiate with Real American Brands, Inc. (RLAB) - We would like approval to renegotiate the Lightning Fund I note for new free-trading shares to

Lightning Fund I. We should renegotiate the $50,000 Mercury note so as get some current liquidity for Mercury Fund.

* * *

14) VCII approval - We would like you to ask SEC to lay off its objections. I would like your cooperation for the Vivi Cells transaction, so that hopefully we would have the SEC not object Bankruptcy Court approval of the plan.

15) GBRC warrants Mercury. GBRC warrants expire on 12-3109. They are substantially in the money. The stock is liquid. We need to consider a plan for exercising them, perhaps serially. There is no cashless exercise option.

16) Sanswire Corp. (SNSR) (formerly Globetel Communications, Corp.) - We should file suit, for default on the note. - We have prepared the complaint and identified local counsel for Fortuna Fund. Liability is clear-cut. Suit needs to be filed in New York in accordance with the jurisdiction selection clause. There is a summary procedure in New York on promissory notes.

* * *

19) Other suits by Fred Harbecke - Fred Harbecke has filed several suits [on behalf of the Funds]. He is prepared to withdraw from all the suits or any of the suits, as you desire. However, inasmuch as several of them would require someone at your firm to get up to speed, it may be more expedient to allow him to continue on some or all of them.

20) Judgment against RMD Entertainment. We have judgments against RMD Entertainment (and against Giorgio Costonis, officer) and against Solar Night and against Medical Services, Inc. (and against Robert Talbot, officer).

21) We should renegotiate the current indebtedness Apple Rush and Spooz, Inc. but, in both instances, we could not get free trading shares, making this less imminent.

- and -

22) Eventually, we would like to file suit against Integrative Health Technologies, Inc.(IHTI) for its breaches."

48.     At first Weiss ignored these requests altogether.  When she addressed any

of the items on the list, she did so only after months of delay, when the opportunities which had existed at the outset of her receivership had disappeared or diminished. Had she at least investigated these recommendations, she would have been in a position to make beneficial decisions on behalf of the Funds and, as detailed herein, would have been able to generate millions of dollars of profits for the Funds.

## I. Weiss' Failure to Engage A Qualified Funds Manager or Investment Advisor in Contravention of the Order Appointing Her

49.     Apart from one and no more than two occasions in which Weiss converted portions of debt to stock and thereafter profitably sold the stock resulting from the conversion, any activity Weiss took could only be considered a step toward liquidating, rather than operating, the funds. She sold back debentures to portfolio companies at a fraction of their value; abandoned lawsuits; abandoned efforts to collection of judgments obtained against companies capable of satisfying them; and terminated or abandoned new transactions that represented significant value for the funds.

50.     Therefore, Weiss violated the purpose and letter of the receivership order since that order prohibited Weiss from unilaterally deciding to liquidate the Funds and authorized the appointment of substitute general partners or new investment advisor to operate the Funds.

51.     The Funds are investment pools which are exempt from registration as

investment companies pursuant to section 3(c)(1) of the Investment Company Act of 1940. Nutmeg was registered with the SEC as an investment advisor. Under SEC Rule 203(b), which was in effect between February and June 2006, and the Dodd/Frank Wall Street Reform and Consumer Protection Act enacted in July 2010, advisors of unregistered investment pools such as the Nutmeg Funds must register as investment advisors with the SEC.

52.    Furthermore, managing PIPES and similar assets is recognized as a specialty, which requires unique skill sets that can only be obtained through experience. For example, a PIPE asset manager needs to closely follow the press releases and SEC filings of portfolio companies; understand the effect of reverse stock splits; attempt sell stock resulting from the conversions in a manner that protected its trading price; maintain a relationship with the management of the portfolio company which will enable terms to be renegotiated; understand SEC Rule 144; understand holding requirements, tacking rules and procedures for expeditiously clearing the legends to enable one to sell such shares; understand the securities registration process; understand how conversion formulas are calculated; establish and maintain relationships with brokers that will permit stock to be traded in accordance with SEC Regulation SHO before the physical certificates are actually delivered to the broker; understand how to maintain the value of reporting shells that the debenture holder may acquire in the

event a portfolio company defaults when it has no other marketable assets; understand

the market for unregistered securities; understand how to realize value of "in the

money" warrants in situations where only a limited amount of cash is available to

exercise the warrants; understand the procedures for freeing restricted securities for

trading; understand how stock transfer agents , DTC Corp. and brokers can be

coordinated to swiftly obtain delivery of certificates; and understand SEC Rule 504 and

how and when and under what circumstances Rule 504 shares can be traded.

53.     Weiss had no background as any kind of investment advisor, trader, fund

manager or asset manager and no experience in the highly specialized area of PIPE

assets. This is precisely why the order appointing her granted her authority to select

"substitute advisers or general partners for the Funds[.]"

54.     On information and belief, Weiss never even subscribed to a reporting

service in order to monitor stock prices of the PIPE transactions.

55.     Weiss' attempt to operate the funds herself without the assistance of an

experienced PIPE manager as a substitute advisor or general partner was a breach of

fiduciary duty to all of the funds. Illinois state securities regulations require that

investment advisors successfully completed the Series 65 examination administered by

the North American Securities Administrators Association. Investment advisors are

considered professionals and held to professional standards of competence and must

have sufficient backgrounds because, as the Supreme Court recognized in *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192-193 (1963), the 1940 Act "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship."

56.     Weiss compounded the harm stemming from her lack of background and training by repeatedly rejecting out of hand advice which she received from Plaintiff without considering that advice on its merits.

**J.  Unauthorized Expenditures on Crowe Horwath and Refusing to Require Crowe Horwath to Complete the Work it Had Agreed to Do Within the Court-Approved $150,000 Fee**

57.     On April 3, 2009, shortly following the commencement of the *SEC v. Nutmeg* action, Judge Hibbler entered an order requiring that *Nutmeg* provide an "accounting" of: (1) all funds received from the individual investors, (2) all "fees, compensation or expense reimbursements" received directly or indirectly from the individual investors and (3) "a listing of all assets or liabilities" of Nutmeg and the funds -- *i.e.*, essentially, the basic information that would be required to make distributions to individual investors.

58.     The order also required that Nutmeg and the SEC agree on an independent CPA firm to "prepare" this accounting.   Eventually, the Court appointed Crowe Horwath, which had agreed to cap its fees at $150,000 and the $150,000 fee cap

was reduced to a Court order.

59.     Crowe Horwath was paid approximately $21,000 by Nutmeg prior to Ms. Weiss' appointment. Between June 1, 2009 and August 10, 2009, Crowe Horwath incurred $147,857.63 ($126,857.36 beyond the initial payment), and then ceased working completely.  On December 3, 2009, as receiver, Ms. Weiss moved for Court approval for the payment of the outstanding $126,857.73 in time charges to Crowe Horwath, all of which had been incurred prior to August 10.

60.     On December 9, 2009, Judge Hibbler entered an order which approved the $126,857.73 in outstanding Crowe Horwath time charges. At the hearing of the motion, it was disclosed that Crowe Horwath had not completed the work required under the April 3, 2009 order because Judge Hibbler entered an order that Crowe Horwath was to submit an estimate as to the additional time and expense needed to "complete" its responsibilities. Judge Hibbler was requesting an "estimate" of what Crowe Horwath needed beyond the existing $150,000 fee cap so that he could *then* decide whether or not to approve it.  Judge Hibbler's open court statements were not a self-executing increase in the fee cap and did not modify the fee cap. Thereafter, Weiss electronically filed Crowe Horwath's "Estimate of Expenses" on the Court's ECF docket. In this document Crowe proposed three *new* "phases of work": "Phase I (A) - Analyze Activity in Nutmeg's Bank & Brokerage Accounts" and "Phase I (B) - Analyze Transactions among

Nutmeg and other Relief Defendants" -- and "Phase II - Analysis of the Funds." The total estimated cost of the work, was *an additional $168,631.50* -- more than the entire amount required under the original fee cap.

61.     Furthermore, the Estimate stated that one of the principal tasks Crowe was charged with under the original order: identification of "investor transactions" -- *i.e.*, the limited partners' capital contributions and distributions -- had been completed only for Mercury Fund but not any of the other funds. Even for the Mercury Fund, Crowe Horwath was declining to summarize these investor transactions until fees were authorized for it to "validate" those transaction by examining bank documents.

62.     While the April 9, 2009 order focused on calculating what the Funds had received from investors and distributed back to investors, the work proposed in the Estimate of Expenses was aimed at investigating the SEC's claims that Nutmeg, Plaintiff and the other "relief" defendants had received excessive or improper compensation from the Funds. For example, the "Estimate of Expenses" proposed that Crowe Horwath would "identify . . . amounts transferred to the Relief Defendants" and "trace the transfer of funds from Nutmeg's accounts to the bank and/or brokerage accounts of the Relief Defendants and determin[ing] the subsequent uses of those funds."

63.     This means that Crowe Horwath was proposing -- with Weiss' approval -- investigating the SEC's claims against Nutmeg, Plaintiff and the other relief defendants.

64.     Since Crowe Horwath had been appointed as an agent *of the Court* and required to perform certain limited task *on behalf of the Court*, a change so that its role involved an investigation of the SEC's charges -- *i.e.*, research and consulting on behalf of one of the parties --- was, if not legally problematic as a separation of powers -- at least should have been approved by Judge Hibbler.

65.     After posting Crowe Horwath's "Estimate of Expenses" on the Court's ECF System, neither Ms. Weiss, nor any other party, moved for approval of the either the additional funds or the new tasks -- *i.e.*, investigation of the SEC's disgorgement claims -- proposed in Crowe Horwath's Estimate of Expenses.

66.     Accordingly, Judge Hibbler never entered any order which approved either paying Crowe Horwath more than $150,000 or performing the investigation of the SEC's charges, as proposed in the Estimate of Expenses. In fact, there is no indication that the Crowe Horwath "Estimate of Expenses" was even made known to Judge Hibbler.

67.     Nevertheless, Weiss acted as if that Estimate had in fact been approved by the Court by proceeding to pay Crowe Horwath an additional $193,234.10 beyond the $150,000 fee cap for investigating the SEC's claims.  Had Weiss complied with her duty to notify the limited partners about the disassociation of Nutmeg as general partner, and the resulting opportunity for the limited partners to admit a new general partner of their own choosing, the new general partner could have made its own decision about

whether to hire an accounting firm to pursue claims against Nutmeg, Plaintiff and the

relief defendants or, instead, rely on the SEC's obligation to investigate its own claims.

**K.   The Failure to Pursue the $2.9 Million
       <u>Judgment Against RMD Entertainment</u>**

68.    On December 11, 2008, a $2,900,000 judgment was entered in favor of the

nominees of various Nutmeg Funds against RMD Entertainment Group, Inc. in a case

entitled *The Nutmeg Group, LLC, et al. v. RMDM Entertainment Group, Inc.*, Circuit Court,

Cook County, Case No. 06 L 008867.  Specifically, for the benefit of the Michael Fund

and October 2005, Financial Alchemy, LLC had obtained a $538,964.00 judgment against

RMD; for the benefit of Michael Fund and October 2005 Fund, Nutmeg obtained a

$1,386,325.35 judgment against RMD; and for the benefit of Michael Fund and October

2005 Fund, Philly Financial, LLC obtained a $993,446.51 judgment against RMD.

Altogether, Michael Fund's interest in this judgment was about $2,200,000 and October

2005 Fund's interest was about $500,000.

69.    The judgment was entered w will hen RMD ceased defending the lawsuit,

and the damages were awarded after an uncontested evidentiary hearing. The judgment

was fully enforceable outside of Illinois under the Full Faith and Credit Clause and the

applicable state statutes concerning recognition of foreign judgments.

70.    Plaintiff disclosed the existence of the judgment against RMD to Weiss in

his July 2009 memorandum advising Weiss of pressing items of business.

71.     After months of trading at .0001 per share and insignificant volume, the price of RMD stock went to .0002 per share on October 19 and reached a daily high of .0002 per share on substantially increased volume on each day between October 19 and October 21.

72.     On October 21, 2009 Plaintiff emailed Weiss and stated: "RMD[] Entertainment [is] showing some life. Perhaps it's a good time to contact them, for shares or payment, since we have a judgment." Despite the magnitude of the judgment and the consequent prospect for the Funds, Weiss did not respond to the email.

73.     On October 28, 2009, 1,000,000 RMD shares traded, doubling the previous high volume.

74.     In October 2009, RMD announced an anticipated merger with United Liquor Alliance, Inc., an entity which claimed ownership of a unique liquor distillation process.

75.     On October 29, 2009, the volume reached a record 1,750,000 shares traded, and the price went to .0004, doubling the previous high. That same day, Plaintiff emailed Weiss, included a copy of a press release concerning the United Liquor acquisition, and stated, "[N]early 2,000,000 shares ($300,000) traded today. As indicated before, this would be a good time to contact the company and settle the judgment for shares that could be traded." Once again, Weiss ignored this email.

76.     On November 12, 2009, as disclosed publicly, RMD acquired all of the
outstanding stock of United Liquor Alliance, Inc. in exchange for 25,300,000 shares of
RMD stock. RMD's United Liquor stock was an asset that was subject to execution by the
Nutmeg-affiliated judgment creditors. Nevertheless, Weiss never took any steps to
execute on that judgment.

77.     On December 22, 2009 -- a day when the RMD stock price tripled its
previous high to .0012 -- Weiss finally emailed Plaintiff and asked for his contact
information at RMD.

78.     On December 24, 2009 -- at a point in time when the price remained in
the range of the high achieved on December 22 and the volume was now 57,790,000 --
and indicated that she believed that the judgment was based on a failure to appear (in
which case it might not have been immediately or necessarily enforceable in other
states).  In fact, RMD's default had occurred *after* appearance, which she would have
known had she reviewed the file. This is a critical distinction, since a default judgment
obtained after the defendants' appearance can be domesticated and enforced in any
state.  Plaintiff informed her that the judgment had been obtained after RMD's
appearance and suggested that Weiss contact RMD's investor relations firm, and
threaten or pursue enforcement remedies. Once again, Weiss ignored Plaintiff's
suggestion.

79.     On January 13, 2009, Plaintiff emailed Weiss and forwarded to her electronic copies of his correspondence with RMD's management (since Weiss had apparently misplaced the original hard copy of Nutmeg's RMD file).  Also on January 13, RMD stock traded as high as .0014 per share and had a total volume of 118,050,000 shares.

80.     On January 14, 2009, Plaintiff emailed Weiss and stated: "If we hire local counsel in Florida we could register the judgment and levy their bank accounts." Weiss responded: "why Florida?," despite the fact that, had she reviewed the file, she would have known that United Liquor was located in Florida, and that in a Florida proceeding, the judgment creditors would have been able to attach any obligations that United Liquor had toward Nutmeg (such as dividends) and restrain and enjoin any dissipation of United Liquor assets while an order for the turnover of RMD's United Liquor stock was sought from the Cook County Court.

81.     On January 20, 2010, Weiss emailed Plaintiff and indicated that she was taking seriously a false claim by RMD's counsel that the judgment was, for some unspecified reason, "not legitimate."

82.     Apparently thereafter Weiss ceased to communicate with Plaintiff.

83.     On information and belief, during 2010 RMD raised between $20,000,000 and $30,000,000 in the equity markets. Given RMD's ability to raise money in the equity

markets, it is likely that, had enforcement measures been pursued (such as seeking the

turnover of RMD's United Liquor stock), a substantial part of the judgment could have

been collected either by executing on RMD's assets or attaching its receivable or in a

negotiated settlement.

84.     Thereafter, Weiss took no action whatsoever to attempt to obtain any kind

of relief from RMD.

85.     Weiss' refusal to take any steps to enforce the judgment against RMD was

intentional and a breach of her fiduciary duties to the Nutmeg affiliated entities who

held that judgment.

86.     Barnes & Thornburg's failure to advise Weiss that effective enforcement

remedies such as the turnover or attachment of RMD's stock in United Liquor

constitutes legal malpractice.

## L. Weiss' Failure to Exploit the Opportunities
   Presented By Mercury's Investment in GoIP

87.     Mercury Fund held a convertible debenture dated April 14, 2008 which it

had received from GoIP Global, Inc. (GoIP) and had a principal amount of $50,000. The

note matured on April 14, 2010. The conversion price under the GoIP note was the lesser

of (a) $0.25 per share Maximum Conversion Price or (b) 70% of the average closing bid

price during the ten days preceding Conversion.

88.     The July 2009 list of important items which Plaintiff provided to Weiss

stated, with respect to GoIP, that it was "important to get . . . free-trading shares" of GoIP stock for Mercury.

89.     The First Interim report which Weiss filed with the Court on October 8, 2009, indicates that Weiss did not understand that the value of the GoIP note consisted of the conversion rights it granted Mercury, since in it she stated that the: *President [of GoIP] thinks he can pay off the note in January [2010], but is going to come up with a plan for issuing shares.*  Weiss' apparent interest in allowing GoIP to pay off the note made no sense, since that would have foreclosed Mercury's ability to convert the GoIP debt into stock, at an extremely substantial profit, with a value exceeding 62 times the value to be derived from receiving payment on the note.

90.     Furthermore, Weiss' statement that GoIP's president (Ike Sutton) was going to come up with a plan for issuing shares reveals that she did not understand that she had unilateral power to obtain GoIP stock simply by issuing a conversion notice, and did not need to either settle the case or wait for Sutton's "plan to issue shares."

91.     Prior thereto, at Plaintiff's insistence, Weiss converted $10,000 portion, without accumulated interest, of a $50,000 debt, exclusive of interest, of the indebtedness on November 11, 2009.  For this conversion, based on the 10-day "look back" period, the undiscounted conversion price was .00149 and, after application of the 30% discount factor, the effective conversion price was .00104 per share and the

$10,000 portion of the debt converted to 9,587,728 shares.

92.     Thereafter, inexplicably, Weiss did not convert any additional portion of the GoIP debt to stock, despite the fact that conditions for converting became ideal in early February 2010 and, in fact, far better than they had been back when she converted the $10,000 portion of the debt on November 11, 2009.

93.     Specifically, after seven trading days between January 19 and January 29, 2010 during which the GoIP volume averaged 40,000,000 shares per day, it suddenly jumped to 154,440,000 shares on February 1, 2009. On February 1, GoIP stock traded at a high of .0012, a 50 percent increase from the January 29 high. The volume remained very high on February 2 (125,550,000) and February 3 (138,820,000). The stock traded at a high of .0012 on February 2 and .0017 on February 3. While the daily high rose from .0008 to .0017 during the January 29 to February 3 period, the daily low -- the price relevant to determining the conversion rate rose only from .0007 on January 29 to .0010 on February 3, 2009. Thus, the spread rose from .001 to .007 during this period. These trends, very high volume, rising prices and increasing intra-day spread continued. For example, on February 8, 240,280,000 GoIP shares were traded, the high hit .0038 and the low rose only to .002, for a spread of .0018.  Also, on February 1, an analyst, Kinsley Street Investors rated GoIP an "aggressive buy" and published an interview with GoIP CEO Ike Sutton in which he described the GoIP technology and his plans for to create a

text-messaging platform for advertisers which would enable consumers to immediately respond by using a text prompt in the advertisement.

94.     The dramatic and sustained increase in volume, the rapidly rising prices, the increasing spread, the analyst's aggressive buy recommendation and the Sutton interview represented a confluence of factors -- "perfect storm" conditions -- which would have compelled any competent funds manager familiar with PIPE assets to immediately convert either all or at least a large part of the remaining amount of the debt.

95.     There was little risk in converting during this period. Given the lengthy look back period, the substantial spread between the daily high and the low, the right to use bid (low) prices in the calculating the conversion price and the 70 percent discount, the price would have had to decline to .0005 percent while Mercury was still holding it for the conversion not to be profitable in comparison to the amount of debt converted. (Also, Mercury did not need to lay out any cash in the conversion process.)  If Weiss had converted on February 4, 2010, since the conversion price was based on the daily low bid (which was either at or lower than the daily low sale price), the undiscounted conversion price would have been .00077 (or less, if the average bid were lower than the average low sale price) and the discounted conversion (applying the 70% discount factor) would have been no higher than .000539. By this time the stock was in a clear

upward pattern and had traded as high as .0017 on two consecutive days. If Weiss had

converted on February 8, 2010, the undiscounted conversion price would have been

.009 and the discounted conversion price .0063, on a day where the stock traded as high

as .0038 at record levels of volume. The *de minimis* degree of risk is reflected by the

fact that the price had not descended to a level as low as .0005 since December 23 and

December 24, 2009 and, on December 23 and December 24, had only remained at .0005

for those two days. During lengthy periods both before and after December 23 and

December 24, the stock had traded much higher than .0005.

96.    The extremely limited risk from converting and the large upside given the

confluence of positive factors mandated converting at some point in early February.

Had Weiss converted on, *e.g.*, February 4, her undiscounted conversion price would have

been .000539; the number of shares she would have received would have been

74,211,504 (in addition to the 9,587,728) she had already obtained from her November

11, 2009 conversion. Weiss sold the 9,587,728 in mid- to late March for an average

price of .0124 per share. If she had converted the rest of stock on or about February 4 --

as she should have -- and continue to sell at the same modest pace (approximately 10%

of the daily sales volume, per trading day, as most managers of small cap assets would

advise) which she had sold the 9,587,728 shares, she would have received an additional

$2,500,000 of sales proceeds from the converted GoIP debt. In fact, had she converted

the remaining portion of the debt and begun to sell in mid-to late March (as she did with the 9,587,728 shares) and sold it at an appropriately gradual rate, she would have caught a strong upward price movement in late March and obtained an estimated additional $2,500,000.

97.     Instead, however, Weiss did not convert any additional amount of the convertible debt and, incredibly, sold it back to GoIP for $41,209 in March 2010, an amount less than the remaining portion of the debt and the outstanding interest.  If, instead of selling the debenture back to GoIP, Weiss had instead simply converted it at that time and then sold it in a reasonably prompt fashion, she would have obtained substantial profits given the large discount and the fact that the conversion price was tied to the daily low.

98.     As it was, Weiss received $160,448, consisting of the $119,239 in proceeds from the sale of the 9,587,728 shares she received when she converted the $10,000 portion and (without interest) of the debt on November 11, 2011, together with $41,209 she received from GoIP when she collected the remaining amount of the debt after the maturity dated.

99.     Weiss' intentional refusal to convert the remaining portion of the GoIP debt when all relevant factors dictated that she do so, cost Mercury approximately $2,450,000 and as plaintiff will demonstrate at trial, damages in that amount.

### M.  The Failure to Exploit Patriot's Conversion Rights
### Under the Debenture From Secured Financial and Failure to
### Sell Patriot's Secured Financial Stock in a Timely Fashion

100.    In 2006, Patriot Fund invested $297,500 in Secured Financial and received two debentures from Secured Financial:  one in the amount of $200,000 and the other in the amount of $97,500.

101.    After several partial conversions, Patriot and Secured Financial renegotiated the terms of the debt.  Under the renegotiated terms, Secured Financial's obligation was fixed at $312,232.06 and Secured Financial agreed to give Patriot an additional 1,025,641 free-trading shares.

102.    Plaintiff's July 2009 list of matters requiring prompt attention informed Weiss that Patriot had recently received 1,025,641 shares from Secured Financial and recommended that she immediately sell them.

103.    Weiss took no action in response to Plaintiff's advice. Had she acted when Plaintiff advised her to, or with reasonable promptness, the shares could have been sold in September 2009, when the price was trading around .012 cents a share. Instead, she did not sell the stock -- or even deliver it to a broker -- until much later when the price had fallen to $.07 per share. Had the stock been sold in September, or at a reasonable time after Plaintiff alerted her to the opportunity, Patriot would have received an additional $120,000 in proceeds.

104.    With respect to the remaining convertible debt, which had been reset

$312,232.06, Weiss failed to convert any portion of it to stock. This represented a

substantial loss. Given the 40 percent discount formula, the stock was easily convertible

at a profit, and could even have been sold for proceeds well in excess of the amount of

the converted debt even in a downward trending market.

105.    Instead of converting any portion or the remaining debt, Weiss settled it

for $190,000 according to the Third Interim report she filed with the Court in January

2010.

106.    This settlement was reckless and grossly incompetent.  Specifically, Weiss'

Third Interim report revealed that she *believed* that only $312,232.06 was due under the

notes, which confirms that Weiss overlooked a total of $154,570 in additional interest

and penalties which had occurred following the settlement in December 2008.  Weiss

agreed to a settlement without knowing the actual amount of Patriot's debt or the

extent of its actual leverage. Furthermore, the stock remained liquid and its price had

been stable. From the time she was appointed receiver through January 2010, the

Secured Financial trading volume remained substantial and the price declined only

gradually. This means that she could have converted the remaining portion of the debt

for stock that she would have been able to sell for approximately $775,000. Instead, she

settled the remaining portion of the debt for only $190,000.

107.    Patriot's losses stemming from Weiss' incompetence and mismanagement thus included a total of $585,000 for settling the remaining debt for $190,000 instead of converting it and an additional $120,000 for failing to sell the unrestricted stock in a timely fashion.

**N.  The Failure to Pursue Fortuna**
     **Fund's Claims Against Sanswire**

108.    In Plaintiff's July 2009 memo to Weiss, he noted that Sanswire was in default of its obligations under the convertible debenture it had given Fortuna, and advised Weiss to commence a summary proceeding in New York pursuant to CPLR 3213, a provision which enables the holder of promissory note to move immediately for summary judgment.  At the time, Sanswire owed Fortuna at least $120,000.  Weiss ignored this recommendation

109.    On November 5, 2011, Plaintiff emailed Weiss and reminded her of Fortuna's claim against Sanswire and pointed out that the volume and trading price of Sanswire stock had recently risen significantly.

110.    On December 1, 2011, Plaintiff emailed Weiss and asked her whether she was doing anything with Sanswire.  Weiss did not respond to this email.

111.    At some point in December 2009, Weiss apparently demanded payment from Sanswire. After Sanswire failed to respond to her, on December 22, 2009, Weiss wrote to Sanswire's CEO, Jonathan Leinwand, and threatened litigation but

unfortunately did so in an entirely incoherent fashion. Specifically, Weiss' email to

Leinwand stated: "if this matter is not resolved, I will have no choice but to *initiate*

*summary proceedings in federal court against Sanswire*." Federal subject matter

jurisdiction requires either a federal question or complete diversity among adverse

parties. Neither federal question nor complete diversity existed in the dispute between

Sanswire, which had its main office if Florida, and thus was a domiciliary of Florida and

Fortuna, a limited partnership with Florida limited partners (and thus, also, a Florida

domiciliary). Also, no "summary procedure" is available under the Federal Rules of Civil

Procedures (apart from summary procedures available under state law that may be

utilized under F.R.Civ.P. 69(a)(1) after a judgment is obtained).

112.    Not surprisingly, given the lack of understanding of federal jurisdiction and

civil procedure reflected in Weiss' email, Sanswire's management and attorneys did not

take Weiss' threats seriously, called her bluff, and the matter went unresolved with Weiss

taking no action to enforce the claim.

113.    Three months later, in March 2010, Weiss asked Plaintiff to re-send her

certain information she had previously been given concerning Sanswire. While Plaintiff

sent her the information, Weiss did not follow through and never commenced a lawsuit

to recover the outstanding debt on behalf of Fortuna from Sanswire.

## O.  The Intentional Termination of the Advantageous INverso Agreement Which Had Been Concluded by Nutmeg

**For Mercury Fund, Fortuna Fund and Patriot Fund
and For the Benefit of the Tropical Fund, MiniFund,
MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund,
Startech Fund, Lightning Fund I and Image Globe Fund**

114. INverso was a "Form 10" or "non-trading" public shell company. A Form 10 shell does not trade but files reports with the SEC under the 1934 "Filing Reports Act." Nutmeg had acquired INverso stock for its own account, on behalf of Mercury, Fortuna and Patriot and in trust and for the benefit of other Funds -- *i.e.*, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, October 2005 Fund and Lightning Fund I and Image Globe Fund -- to which Nutmeg intended to assign all or part of its INverso stock. Nutmeg, Mercury, Fortuna and Patriot held 44,907,404 shares of INverso stock, representing approximately a 94 percent ownership interest.

115. Prior to the filing of the SEC action Nutmeg, on behalf of Mercury, Fortuna and Patriot had reached an agreement with individuals named Mitchell Felder, M.D., a prolific inventor and a medical research physician, and William Hartman, who had been involved in funding Felder's research. The agreement provided that:

> (a) INverso would acquire license certain medical patent rights held by Felder and Hartman.
>
> (b) Hartman and Felder would together receive a 90 percent ownership interest in INverso in the form of "preferred stock" that was restricted and subject to a one year lockup period, and Plaintiff would resign from the position he held as Chairman of the INverso

board and appoint Hartman as successor.

(c) Nutmeg, Mercury, Fortuna and Patriot would have receive $225,000 for redemption of approximately for a small fraction of the shares they held.

(d) Nutmeg, Mercury, Fortuna and Patriot would keep nearly all of their 44,907,404 shares of INverso stock which would represent approximately a 9 percent ownership interest in the company.

(e) Felder and Hartman would cause INverso to effectuate and IPO.

- and -

(f) Most importantly, the stock held by Nutmeg, Mercury, Fortuna and Patriot would have been free-trading upon the effectiveness of the registration statement for the initial public offering, and would have represented 88 percent of the free trading stock, following the IPO (since the stock issued to Hartman and Felder would have been restricted, not free trading).

116.    Under the transaction as structured, all Plaintiff (acting on behalf of Nutmeg and the Funds) was required to do was resign and appoint Hartman his successor.  At that point Hartman would be free to cause INverso to issue the additional restricted stock to Felder and to himself.

117.    This transaction, though "dilutive" of the interests Nutmeg, Mercury, Fortuna and Patriot had in INverso (since it gave Felder and Hartman a 90 percent interest in INverso), was highly beneficial to Mercury, Fortuna and Patriot (and the other Funds Nutmeg had required stock on behalf of). Had it been completed, the Nutmeg-affiliated interests would have together owned a 10 percent interest (and 88 percent of

the freely tradeable stock) in a public company which held valuable medical technology. The transaction also would have caused Nutmeg, Mercury, Fortuna and Patriot to receive $225,000. *After* the receiver terminated the transaction, Nutmeg, Mercury, Fortuna and Patriot were restored to their 94 percent ownership of INverso but INverso remained merely a shell.

118.    Also, following the rescission of the agreement with Felder and Hartman, Weiss did not even continue to file the 10-K and 10-Q reports that were necessary for INverso to retain its status as a reporting shell -- let alone make the Form 4 or 13G or 13D filings which would have increased its value. Nor did Weiss even attempt to market the INverso shell.

119.    Plaintiff's July 2009 list of items demanding Weiss' immediate attention identified the INverso transaction and his desire to immediately resign from his position as Chairman of the INverso Board. However, according to the time sheets of Weiss and Barnes & Thornburg, no time was spent reviewing the INverso transaction until August 31, 2009, when Weiss' time sheets contain a reference to "review material on INverso" among numerous other matters addressed that day.

120.    On August 26, 2009, Plaintiff emailed Weiss and other attorneys at Barnes & Thornburg, and copied the SEC attorneys who had appeared in the *SEC v. Nutmeg* action on the email. This email attached Hartman/Felder business plan and directly

stated that Plaintiff intended to resign as Chairman of the INverso Board and appoint a successor unless Weiss indicated that she opposed his doing so by September 1, 2009.

121.    Neither Weiss nor the SEC attorneys responded to this email either before September 1, 2009 or thereafter and Plaintiff, as he had disclosed that he would do in his August 26, 2009 email, appointed Hartman and two affiliates of Hartman as INverso directors.  Plaintiff also resigned from his directorship and his position as INverso CEO. Thereafter, Hartman became the new president and CEO of INverso.

122.    Hartman and Felder proceed to complete the transaction. Specifically, on September 28, 2009, INverso authorized a new series of preferred stock and 20,000,000 preferred shares. This stock was convertible into warrants which granted the holders -- Hartman and Felder -- the right to purchase 100 shares of the INverso stock for $0.40, or $0.004 per warrant. The preferred stock was also designated as having 100 votes per share. The agreements also provided that the company would effectuate a stock split following the issuance of the preferred shares sufficient to create enough authorized but unissued common stock to allow exercise of all the conversions. Following the exercise of the warrants, Hartman and Felder would own about 90 percent of the common stock. However, unlike the stock held by Nutmeg, Mercury, Fortuna and Patriot, the stock held by Hartman and Felder would be locked up and untradeable for a year.

123.    On September 28, 2009, INverso licensed several pending and/or

provisional patents from Hartman's companies, Altman Enterprises, LLC and Marv

Enterprises, LLC. The technology licensed from Altman Enterprises concerned treatment

of auto-immune diseases, and the technology licensed from Marv Enterprise concerned

treatment of blood-borne carcinoma and extra-corporeal blood treatments. In

consideration for these licenses, the Company issued 1,234,074 to Altman and 617,037

shares of preferred stock to Marv, and agreed to pay a royalty of five percent (5%) of

any sales of products using the technology, with no minimum royalty, and pay the costs

of any necessary patent prosecutions.

124.    On November 23, 2009, INverso filed a 10-Q with the SEC disclosing the

entire transaction, including Plaintiff's resignation, the appointment of Hartman and his

affiliates as directors, and the appointment of Hartman as president and CEO and the

license agreements.

125.    On November 30, 2009, INverso distributed private placement materials to

various potential investors. This was part of an intended "partial private placement" or

"mini-offering" which was intended to add at least 50 new shareholders in order to

qualify to trade on the Over the Counter Bulletin Board.

126.    INverso also prepared a form S-1 filing for an initial public offering. If the

public offering took place Nutmeg, Mercury, Patriot and Fortuna would hold

approximately 88 percent of the free trading stock and would have been positioned to

take advantage of any increase in the stock price.

127.    Weiss did not take any steps to oppose the transaction until December 2009 when, in a conversation with Brian LeBrecht, Esq., an attorney for Felder and Hartman, she threatened to oppose it in Court. Thereafter, Hartman informed Plaintiff that unless Weiss withdrew her threat to oppose the transaction, Hartman and Felder would unwind and rescind the transaction to the extent it had been implemented.

128.    When Weiss reiterated her opposition, Hartman and Felder terminated the transaction and began to pursue establishing their public company through another vehicle, Premier Biomedical, Inc. The plan utilizing Premier Biomedical was essentially identical to that which Hartman and Felder has pursued for INverso.  For example, the medical technologies which Altman Enterprises and Marv Enterprises had licensed to INverso, were licensed to Premier Biomedical instead.

129.    The medical technologies which INverso had licensed in the transaction with Felder and Hartman may have significant potential.   Premier Biomedical, Inc., the entity which replaced INverso as Felder's and Weiss' vehicle for creating a public company, assumed Inverso's right under arrangements with Pfizer and William Beaumont Army Medical Center, and circulated emails from Pfizer confirming Pfizer's interest in these technologies.  Premier Biomedical completed an initial public offering in August 2012, with an initial trading price of $1.01, and has since traded at a high of

$1.60 per share.

130. Had Weiss not terminated the transaction, Nutmeg, Mercury, Fortuna and Patriot would have had substantial opportunities to sell stock at the time of or following the INverso public offering. At minimum, the 44,997,104 INverso shares that Nutmeg, Mercury, Fortuna and Patriot held would have represented a 9 percent ownership interest of common in a public company with valuable medical technologies.

131. In early December 2009, Plaintiff sent several emails to Weiss, pleading with her not to abandon this opportunity, explaining how valuable this opportunity was and explaining how she would otherwise never be able to get anything for the shell and that therefore she was giving up 44,997,104 INverso shares and getting nothing in return for the investors.

132. Defendants directly misled Judge Hibbler concerning the INverso transaction. Specifically, in December 2009, after Weiss had terminated the transaction, the SEC moved to have Plaintiff held in contempt for resigning from his INverso transaction and appointing Hartman and his affiliates to the Board. In connection with this motion, a letter was presented to the Court written by Barnes & Thornburg attorney Kevin Driscoll to Plaintiff on December 4, 2009 which stated that "[p]rior to September 9, 2009," Weiss had communicated with Plaintiff about the transaction and informed him that she "opposed the transaction" and that Plaintiff, nevertheless, "proceeded to

consummate" the transaction.  The SEC cited Driscoll's email as proof that Plaintiff has

resigned from INverso *after* learning that Weiss has opposed the transaction. However,

Driscoll's letter was false and misleading.

133.    In fact, Weiss did not communicate with Plaintiff about this transaction or

review any documents concerning it prior to August 31, 2009.  Also, Weiss entirely did

not respond in any fashion to Plaintiff's August 26 email and thus acquiesced in

Plaintiff's resignation, not offering any objection whatsoever.  In fact, following August

31, Weiss did not bill any time in connection with the INverso transaction until

September 15, when she had a telephone conference with Hartman's attorney, Brian

LeBrecht, Esq.   Driscoll's statement in his letter to Plaintiff falsely indicated that Weiss

had opposed Plaintiff's resignation from his INverso positions.  By allowing the SEC to

argue that Plaintiff had resigned from his INverso positions over Weiss' objection, Weiss

and Barnes & Thornburg were permitting the Court to be misinformed.

**P.  Failure to Prosecute Nutmeg/Nanobac Fund's**
   **Valuable Claims Against Nanobac**

134.    In 2004, Nutmeg, on behalf of Nanobac Fund, invested in into Nanobac

Pharmaceutical, Inc. (Nanobac) in exchange for agreed upon amount of Nanobac

common stock and warrants and Nanobac's agreement to file the necessary registration

documents to make the stock delivered to Nutmeg tradeable. Nutmeg later assigned its

rights under this agreement to Nanobac Fund.  However, Nanobac, contrary to its

promise, did not effectuate the registration of Nutmeg's stock.

135.     In 2006 Nutmeg and Nanobac renegotiated the terms of their deal. Under

the renegotiated terms, Nanobac's principals, Alex H. Edwards and John Stanton, agreed

to deliver issue to Nutmeg stock in three of Nanobac's affiliates -- Escape Velocity, Inc.

Earth First Technologies, Inc., U.S. Energy Initiatives Corp. and Cyber Care, Inc. --

together with Nanobac warrants exercisable at $.06 per share.

136.     However, Nanobac, Edwards and Stanton then failed to comply with the

renegotiated terms.

137.     In 2006, Nutmeg filed suit against Nanobac, Edwards, Stanton and Escape

Velocity in the Circuit Court for Cook County entitled *The Nutmeg Group, LLC v. Alex H.*

*Edwards, et al.*, Case No. 06 L 010990.  The complaint included a claim ("Count I")

alleging breach of the original agreement (since the renegotiated terms were subject to

rescission given the defendants' failure to perform) and another Claim ("Count II")

alleging breach of the renegotiated terms.

138.     Following the filing of complaint, the parties reached yet another

settlement under which Nanobac agreed to deliver 7,100,000 Nanobac shares to

Nutmeg. However, Nanobac failed to comply with this agreement, and on

approximately January 3, 2007, Nutmeg filed an amended complaint to include an

additional claim alleging breach of the settlement agreement requiring 7,100,000 shares

of Nanobac stock to be delivered to Nutmeg.

139.    The claims Nutmeg was pursuing in this case on behalf of Nanobac Fund

were highly valuable:  the damages sought were, on the First Count, $6,577,547.74; on

the Second Count $2,933,917 and, on the Third Count (which was pleaded as an

alternative to the First and Second Counts), $1,633,000.  The lawsuit was being actively

litigated at the time of Weiss' appointment as receiver.

140.    In August or September 2009, Weiss caused Barnes & Thornburg to

substitute in as Nutmeg's counsel in the *Nutmeg v. Edwards* case. On September 21,

2009, at the first court date following the substitution, Barnes & Thornburg did not

appear. The Cook County Court then entered an order providing that if Nutmeg's

counsel did not appear at a conference on November 17, the action would be dismissed.

Apparently, Barnes Thornburg attended that conference since the case was not

dismissed at that time. However, on March 25, 2010, the case was dismissed without

prejudice.  The dismissal without prejudice was not disclosed in any of the interim

reports or other documents that Weiss filed with the Court in the *SEC v. Nutmeg* action

(or otherwise to Judge Hibbler)  and was not reported in of Weiss' communications to

the limited partners.

141.    There was no attempt to reinstate the lawsuit.

142.    Had any steps been taken to prosecute the lawsuit or to reinstate it and

then prosecute it, Nutmeg would have easily obtained judgment on both the First and

Second Counts, since liability was clear cut and no justiciable defenses were raised.

143.    Had the defendants not caused and permitted the *Nutmeg v. Edwards*

case to be dismissed, it could have been settled on extremely lucrative terms between

December 2010 and March 2011.  On December 13, 2010, the trading volume -- which

had been averaging under $100,000 shares on most days -- jumped to 909,000 shares.

The volume then return to its normal range over the next three days. Then, on

December 17, 2010, volume rose to 1,100,000 while the daily high price -- which had

been steady at $.001 jumped to $.0015.  The next trading day, December 20, 2010, the

volume jumped to 45,000,000 shares and the daily high increased by more than six

times to $.0095.  The volume remained extraordinarily high for three trading days and

did not drop below 1,000,000 shares for three full weeks.  Also, while the price rapidly

declined during January 2011 it remained over $.002 (twice the pre-December 17 level)

during that entire month and, generally, has remained over $.002 during 2011.

144.    During the period February 1 through February 8, 2011, another dramatic

surge in both price and volume occurred, with the volume reaching an all-time high of

53,070,000 shares on February 1 and a price of $.004 on February 4.

145.    During this period the claims against Nanobac -- had the claims remained

in existence -- could have been easily settled.  Nanobac was raising substantial funds in

the public equity markets and would have settled any judgment Nutmeg obtained in order to able to continue to do so.  Had Nutmeg reduced those claims to judgment, it would have been able to commence enforcement proceedings which would have threatened Nanobac's ability to continue to raise funds through stock offerings. Even a motion for summary judgment would have threatened Nanobac's ability to raise money through stock offerings and induced a settlement.

## Q.  The Failure to Enforce Mercury Fund's Rights Against North Bay Resources, Inc.

146.    At the time of Weiss' appointment, Mercury was holding a convertible debenture from North Bay and North Bay had defaulted by failing to honor conversion notices.

147.    The memorandum listing items of business which Plaintiff gave to Weiss in 2009 urged Weiss to use the leverage stemming from North Bay's default to negotiate new terms and/or obtain free trading shares and stated that Plaintiff believed that $50,000 of stock could be obtained.  For most of July 2009, North Bay stock was trading at between $.02 and $.03 cents a share, and the daily volume ranged between 75,000 and 800,000 shares.

148.    On November 23, 2009, Plaintiff wrote to Weiss' partner, Deborah Thorne, Esq., and pointed out that the price of North Bay stock had more than tripled since he had asked her to act on it.  Between November 11 and November 23, 2009, the daily

high rose from $.0029 per share to $.007 per share. At this point, North Bay would have had strong incentives to renegotiate the note for tradeable shares rather than force Mercury to file a lawsuit (an event which would likely would have cause the stock price to fall).

**R. Failure to Complete the Collection
   on the Freedman Settlement**

149.    In February 2007, Mercury Fund paid $100,000 to an individual named Jack Freedman in consideration for 2,500,000 shares of free trading In Hip-Hop Soda Shop stock. However, Freedman did not deliver the entire 2,500,000 shares to Mercury.

150.    In December 2007, Mercury sued Freedman in the Illinois Circuit Court for Cook County, Law Division, in an action entitled *Mercury Fund, LLC v. Freedman*, Case No. 2007 L 013898.  In Plaintiff's July 2009 list of items that required immediate attention, he disclosed that, while Freedman and Mercury Fund had agreed to settle, the agreement had not been finalized. Thereafter, Weiss, acting on behalf of Mercury, assumed responsibility for completing the Freedman settlement.

151.    While the settlement negotiations were going on, Weiss caused Barnes & Thornburg to appear as Mercury's substitute counsel in the *Nutmeg/Mercury v. Freedman* lawsuit.  However, after the substitution occurred, Barnes & Thornburg failed to attend a Court appearance, which resulted in the case being dismissed without prejudice. Weiss later caused the suit to be re-filed.

152.    In the latter half of 2009, Freedman and Nutmeg agreed to a $56,000 settlement payable in installments. However, Weiss did not request that Freedman execute a confession of judgment.

153.    Thereafter, Freedman paid only $20,000 of the $56,000 settlement.

154.    Inexplicably, Weiss did not request that Freedman pay the remaining $36,000 to Mercury. Nor did she even take any steps to cause Freedman to pay the remaining $36,000 to Mercury.  Weiss' ability to cause Freedman to repay the remaining $36,000 has been compromised by Barnes & Thornburg twice failing to appear at hearings in Mercury Fund's action against Freedman.

155.    On June 9, 2010 -- well after it was clear that Freedman was not going to pay the remaining $36,000, without at least being encouraged to do so -- Mercury Fund's lawsuit against Freedman was dismissed for want of prosecution, apparently because Barnes & Thornburg had twice failed to attend at a Court appearance. On July 8, 2010, Barnes & Thornburg moved to reinstate the action. On August 24, 2010, the court granted the motion. Then, on November 19, 2010, Barnes & Thornburg voluntarily dismissed the action, but without first collecting the $36,000.

156.    This incompetently prosecuted and repeatedly abandoned action provided little incentive for Friedman to pay remaining portion of the settlement.

**S.  Failing to Pursue the Judgment that Financial Alchemy Had Obtained on Behalf of Lightning Fund I in the *Solar Night Case***

157.    In 2008, Financial Alchemy, LLC as the representative of Lightning Fund I

obtained a judgment in the amount of $205,652 and Solar Night Industries, Inc. in

*Financial Alchemy, LLC v. Solar Night Technologies, Inc.*, Case No. 07 L 3984, Circuit

Court for Cook County. However, after her appointment, Weiss took no steps to obtain

enforce that judgment. The statute of limitations has now expired. Weiss should have at

least filed a motion in the *SEC v. Nutmeg* matter for approval, before abandoning the

judgment claim.

158.    On information and belief, had she pursued collection efforts, she would

likely have been able, at minimum, to obtain the Solar Night corporate shell which, as a

then-current fully reporting and trading entity, would have had a market value in excess

of $100,000.

**T. Abandoning the Claim Financial Alchemy Was Pursuing on
      behalf of Lightning Fund I in the *Asia America Petroleum* Case**

159.    Financial Alchemy, as the representative of Michael Fund, sued Asia

America Petroleum Co. and its principal, Anthony Chirico, in an action entitled *Financial

Alchemy, LLC v. Asia American Petroleum Corp.,* Case No. 07 L 6863, in the Circuit Court

for Cook County. The damages alleged were $229,837. After Weiss became receiver, she

caused Financial Alchemy to voluntarily dismiss this action. Weiss should have

attempted to settle this case before voluntarily dismissing it, or at least filed a motion in

the *SEC v. Nutmeg* matter for approval, before dismissing the suit and irreversibly

abandoning the claim. Prior to making the investment in Asia America, Nutmeg had

reviewed and relied upon certain financial statements. Thereafter, Plaintiff contacted the

accountant whose signature appeared on those financial statements and the accountant

revealed that, actually, he had not signed those statements, and that his signature had

been a forgery, apparently committed by Chirico. Based on this information, Chirico was

named as a defendant and a fraud count against Chirico was included in the complaint.

Even if Asia America Petroleum was judgment-proof, the claim against Chirico was

nevertheless valuable and should have been prosecuted.

160.    Moreover, as a result of a judgment against America Asia Petroleum,

Nutmeg and/or Financial Alchemy, on behalf of the Funds could have taken over the

public entity. Had the Funds taken over the public entity, the public entity should have

been worth approximately $100,000.

**U.  Weiss' Failure to Attempt to Negotiate With the SEC to
     Withdraw its Opposition to the ViviCells/Tropical Beverage,
     Inc. Reorganization Plan and Failure to Participate in
     the Efforts to Achieve a Reorganization Plan that
     <u>Would Have Benefitted Mercury Fund and Tropical Fund</u>**

161.    In 2006, Nutmeg, acting on behalf of Tropical Fund, agreed to invest

$1,000,000 in Tropical Beverage, Inc. In consideration, Nutmeg was to receive free

trading Tropical Beverage stock and warrants in Tropical Beverage, Inc., and Tropical

Beverage, Inc. agreed to file a registration statement and have the statement declared effective within ninety days following closing.

162.    The Registration Rights Agreement provided for liquidated damages if Tropical Beverage, Inc. did not register the shares within 165 days of its receipt of the full amount of the funding.  However, Tropical Beverage, Inc. never registered the shares issued to Nutmeg, and refused to pay the liquidated damages under the Registration Rights Agreement.

163.    At the time Nutmeg made the investment on behalf of Tropical Fund, Tropical Beverage, Inc. was in the business of developing brands of drinking water, and had business plan to establish a distribution network by establishing relationships with bottling facilities and, thereafter, to purchase or establish its own bottling plants.

164.    In 2005, Nutmeg and two other creditors of Tropical Beverage, Inc. commenced an involuntary proceeding under Chapter 11 against Tropical Beverage Inc. and alleged, *inter alia*, that Tropical Beverage, Inc. had failed to comply with the stock registration requirements in their respective contracts.

165.    Thereafter, Vivicells – which was involved in stem cell banks -- was reverse merged into Tropical Beverage, Inc. and Tropical Beverage, Inc. was renamed "Vivicells."

166.    Following the filing the involuntary Chapter 11, Nutmeg and other creditors and Tropical Beverage, Inc./Vivicells (hereinafter, Vivicells) jointly proposed a

plan of reorganization. The proposed reorganization would cause Vivicells' 16

subsidiaries to each issue 100,000,000 shares, with the existing shareholders receiving

5,000,000 of these shares *(pro rata* their respective ownership interests) and the

petitioning creditors receiving the remaining 95,000,000 shares issued by the

subsidiaries *pro rata* the amount of the debt Vivicells owed them.

167.    Under this plan of reorganization, the shares issued to existing

shareholders would be exempt from registration under the federal securities laws by

virtue of Section 4(2) of the Securities Act of 1933 (and comparable state law provisions),

but would be restricted rather than free trading stock. The stock issued to the

petitioning creditors would be exempt from registration by virtue of 11 U.S.C.

§1145(a)(1) (as issued in exchange for the release of preexisting debt), and would be

unrestricted and immediately free trading. The plan also called for the operating

subsidiaries to become reporting companies, and then merge with ongoing businesses

and, where appropriate, be taken public. This plan of reorganization was reached with

the assistance of a court-appointed mediator, was supported by all classes of creditors,

Vivicells' management and all Vivicells' insiders and shareholders.

168.    The plan was submitted to the SEC for approval, and the SEC informed

Vivicells' counsel that it tentatively approved the plan. Vivicells thereafter filed a status

report with the Bankruptcy Court on March 13, 2009 which indicated that the SEC's

concerns -- including a concern over issuing stock exempt from registration to both the existing shareholders and creditors and issuing free trading stock to creditors -- had been satisfied.

169.    However, shortly after the *SEC v. Nutmeg* action was commenced in March 2009, the SEC informed the Nutmeg's counsel that the SEC now had objections to the "financial feasibility" of the plan.

170.    At this point Plaintiff and Nutmeg were barred from acting on behalf of the Funds by Judge Hibbler's freeze order, and therefore prevented from attempting to assist the proponents of the plan from in addressing the SEC's concerns.

171.    Plaintiff's July 2009 list of items requiring immediate attention listed, among the tasks that Weiss should attempt to persuade the SEC to withdraw its objection. However, Weiss did not attempt to address the SEC's objections or propose amendments to the plan which would have allayed the SEC's concern.

172.    Without the assistance of Nutmeg, Vivicells attempted to salvage the plan. Vivicells apparently interpreted the SEC's new concerns as indicating that the SEC did not believe that a source of funding was capable of providing an agreed $300,000 as contemplated by the plan. However, thereafter, Vivicells located Adams Funding, an entity with $12,000,000,000 in assets, to provide this $300,000 and the SEC nevertheless continued to assert an objection.

173.    Had Ms. Weiss attempted to address the SEC's concerns, she could have done so. First, the SEC had tentatively approved the plan of reorganization and that plan had also been approved by a Court-appointed mediator. Second, as Vivicells' status report to the Court indicated, the SEC's original concerns about securities issues had been successfully addressed. Third, to the extent the SEC's new objection actually related to the financial feasibility of the plan, Nutmeg could have agreed to receive fewer shares in an effort to offer better terms to potential sources of funding. However, Weiss did not ever take any steps what so ever to attempt to address the SEC's concerns or remove the SEC's objections to the plan.

174.    On information and belief, Weiss was conflicted by reason of her appointment by the SEC, as receiver, in SEC v. Nutmeg and therefore did not want to confront the SEC's position in the bankruptcy matter, on behalf of the investors.

175.    A plan subsequently proposed by Vivicell's management (but without Weiss' or Nutmeg's support or assistance) was approved by the bankruptcy court. Though the approved plan was not implemented because of a subsequent conflict between Vivicells and a funding source over a small amount of stock, the approved but unimplemented plan indicates that the minimum value of the claims held by Mercury and Tropical was at least $200,000.

176.    Prior to the appointment of Weiss, Nutmeg had been instrumental in the negotiation of the plan of reorganization.  However, after Weiss' appointment, she

caused Nutmeg to abandon all efforts on achieving a reorganization. Had Nutmeg

remained involved it is likely that a plan of reorganization that benefitted Mercury and

Tropical would have been achieved.

177.    Because of Weiss' refusal to address the SEC's objections for the original

plan, and refusal to assist Vivicells and other creditors in preparing a viable plan,

Mercury and Tropical received nothing out of the Vivicells bankruptcy.

## V.    Failing to Pursue the Judgment that Financial Alchemy Had Obtained on Behalf of MiniFund II in the *Medical Services International  Case*

178.    In 2008, Financial Alchemy, LLC, as the representative of MiniFund II,

obtained a judgment in the amount of $955,124.31 against Robert Talbot in a case

entitled *Financial Alchemy, LLC v. Medical Service International, Inc.,* Case No. 06 L 1178,

Circuit Court for Cook County. However, after her appointment Weiss took no steps to

obtain enforce that judgment. On information and belief, had she pursued collection

efforts, she would likely have been able to obtain a settlement in excess of $100,000

and, depending on the extent of Talbot's traceable assets, perhaps well in excess of

$100,000.

179.    The statute of limitations has now expired. Weiss should have at least filed

a motion in the *SEC v. Nutmeg* matter for approval, before abandoning the judgment

claim. On information and belief, had she pursued collection efforts, she would likely

have been able, at minimum, to obtain the corporate shell which, as a then-current fully

reporting and trading entity, would have had a market value in excess of $100,000.

**W.  MIKP**

180.    From 2004 to 2006, various Funds and affiliates of Nutmeg made investments in companies known as eHolding Technologies, Inc., also known as ICM Telecom, Inc. and also known as ICM Communications, Inc.  These obligations were renegotiated and the obligation was assumed by Mike the Pike, Inc., a film and entertainment events developer and producer which was a successor to the foregoing companies following a reverse triangular merger.  Following the renegotiation, the debt was $627,459.62 evidenced by three interest bearing convertible debentures.  October 2005 Fund had a $483,000 interest in these debentures and Michael Fund had approximate a $34,500 interest in these debentures.

181.    The conversion formula set forth in these debentures was: the lesser of (a) $.0017, (b) sixty percent (60%) of the closing bid price for common stock on the trading day immediately prior to closing, or (c) sixty percent (60%) of the average closing bid price for common stock on the five trading days immediately prior to closing, or (d) sixty percent (60%) of the closing bid price for common stock on the trading day immediately prior to the Payee's receipt of shares pursuant to such conversion or payment or notice of such conversion, or (e) sixty percent (60%) of the average closing bid price for common stock on the five trading days immediately prior to the payee's receipt of shares pursuant to such conversion or payment, or notice of such conversion.

182.    When Weiss was appointed receiver, Plaintiff advised her to look for opportunities to convert part of this debt.   In September and October 2009, the trading volume in Mike the Pike stock increased substantially, and the price jumped from an average of .0014 (where it had been prior to September) to approximately .0022 per share. A similar opportunity -- with similar increases in trading volume and price -- occurred between mid-January and mid-February 2010.

183.    Weiss ignored Plaintiff's emails about Mike the Pike until January 21, 2009, when she finally emailed Plaintiff requesting his contact information for the MIKP principals.

184.    Weiss never converted any portion of the Mike the Pike stock, even though there were substantial opportunities for profits given large discount used in the conversion formula and even though, in order to eliminate the risk and improve the debenture holder's ability to obtain a profit, the conversion formula had been based on the lowest of several methods of calculation.

185.    Had Weiss converted when all factors indicated that she do so at some point in September 2009 and/or in January 2010, October 2005 Fund and Michael Fund would have obtained substantial profits.

186.    Given the conversion formula set forth in the convertible debentures, October 2005 Fund and Michael Fund were assured of receiving, at minimum, at least 40 percent profit over the face value of the notes had they been converted, which in the

case of October 2005 Fund's would have been at least $200,000 and in the case of

Michael Fund at least $12,000. On information and belief, had she pursued collection

efforts, she would likely have been able, at minimum, to obtain the corporate shell

which, as a then-current fully reporting and trading entity, would have had a market

value in excess of $100,000.

### X.  Pursuit of the Entirely Frivolous Claims
####     Against Wealth Strategy Partners

187.    In April 2009, Weiss caused Nutmeg to file a lawsuit against Harvey

Altholtz, Wealth Strategy Partners, LLP and Altholtz Family Limited Partnership in this

Court, *Weiss ex rel. Nutmeg, LLC v. Altholtz, et al.*, Case No. 10 C 02609. The case was

assigned to Judge Edmond E. Chang.  The complaint alleged that Altholtz and Wealth

Strategy Partners were not registered investment advisors and, on that basis, sought

disgorgement of finder's fees that Nutmeg had paid to Wealth Strategy. This action was

untimely, frivolous on the merits and a waste of attorney fees expended.   In a decision

dated September 28, 2011, Judge Chang dismissed the Second Amended Complaint on

grounds that the one-year statute of limitations had long expired, and also found "for

the sake of completeness" that the case was entirely lacking in merit.

188.    With respect to the basis for dismissal -- the one year limitations period --

Judge Chang specifically found that Nutmeg had not even responded to the defendants'

argument, stating:

Weiss makes a fleeting argument that the statute of limitations does not apply to some of Altholtz's violations because they occurred less than three years before the complaint was filed. She does not, however, address Altholtz's second argument: that they do not meet the one-year requirement.

189.    Judge Chang's decision also held that Weiss was not entitled to invoke equitable tolling because, rather than acting diligently, she waited nine months following her appointment as receiver before filing the action.  The decision further found that, because Nutmeg had received the benefits of Wealth Strategy's services as a finder and voluntarily paid the fee, Weiss could not show any unjust enrichment.

190.    Also, even if this lawsuit had been successful, it would not have benefitted the Funds, because the fees to Wealth Strategy were paid out of Nutmeg's compensation for its advisory services and any recovery would have gone to Nutmeg rather than the Funds.

191.    Even though Barnes & Thornburg agreed to pursue this case on a contingency basis, approximately 30 hours of billable time totaling $7,500 were billed by Weiss and Barnes & Thornburg to the Funds in connection the *Weiss v. Altholtz* action and Weiss caused the Funds to pay those fees.

192.    Even if this lawsuit had any merit, Weiss & Barnes and Thornburg breached their fiduciary duties and committed legal malpractice by not pursuing it diligently following her appointment as receiver, by not opposing the defendants' argument that a one-year limitations period applied, by failing to proffer a basis for

equitable tolling and by failing to show why principles of unjust enrichment did not

preclude a recovery.

**Y. Weiss' Waste of the Fund Assets Seeking to Compel**
   **Plaintiff to Produce, and Hold Plaintiff in Contempt**
   **for Not Producing, Documents that**
   **Were Already in Her Sole Possession**

193.    As part of her work as receiver, Weiss wasted the Funds' assets by paying

to herself and to Barnes & Thornburg $18,013 in fees to prosecute a frivolous motion to

compel Plaintiff to turn over documents relating to an amendment of the Mercury

Partnership agreement when, in fact, those documents were already in her exclusive

possession.   Relatedly, Weiss also wasted an additional and as yet unknown amount of

the Funds' assets by paying Crowe Horwath fees to perform an analysis of Nutmeg's

entitlements from Mercury which was premised upon her incorrect assertion that the

documents establishing the amendment of this agreement did not exist, at a time when

these documents were in her sole possession.

194.    In the *SEC v. Nutmeg* action, Plaintiff asserted that in 2007 the Mercury

limited partners voted to amend the Mercury partnership agreement to allow Nutmeg

to receive additional compensation in the form of "carried interest" for acting as the

Mercury general partner and investment advisor.  The documents ("the Mercury

Amendment/Carried Interest" documents) establishing the Mercury limited partners'

approval of this amendment were maintained in Nutmeg's offices.  On September 2,

2009, shortly after Weiss had been appointed receiver, she assumed exclusive control of

the Nutmeg's premises and files, including the Mercury Amendment/Carried Interest documents.

195.    Despite the fact that Weiss was in possession of the Mercury Amendment/Carried Interest documents, on April 9, 2010, she filed a rule to show cause which sought to compel Plaintiff to turnover these documents to her and hold him in contempt of the receivership order for failing to do so ("the Turnover/Contempt motion").  Weiss and Barnes & Thornburg prosecuted the Turnover/Contempt motion against Plaintiff even though Weiss -- not Plaintiff -- was in exclusive possession of the Mercury Amendment/Carried Interest documents from September 2, 2009, when Weiss assumed control of Nutmeg's offices, forward.  Weiss paid herself and Barnes & Thornburg a total of at least $18,013 for pursuing this frivolous motion.

196.    Additionally, Weiss' false assertions that she was not in possession of the Mercury Amendment/Carried Interest documents caused fees to be needlessly paid to Crowe Horwath out of the Funds' assets.  Pursuant to an appointment by this Court, Crowe Horwath attempted to determine, *inter alia*, the amount of compensation to which Nutmeg was entitled from each of the Funds.  Weiss' false claims that the Mercury Amendment/Carried interest documents were not in her possession caused Crowe Horwath to base its determination of Mercury's obligations to Nutmeg (or Nutmeg's entitlements from Mercury) on the incorrect assumption that the Mercury partnership agreement had not been amended.  This portion of Crowe Horwath's work is useless

and will have to be revised, again at the expense of the Funds, to account for the effect of the amendment.

197.    Nor did Weiss ever request, whether from her own funds or from Fund assets, that Crowe Horwath redo the analysis and redo its calculations based on the facts that such documents did exist.

198.    Since Nutmeg did not have any available cash at the time of the Weiss was appointed receiver, Weiss has made all payments to herself, Barnes & Thornburg and Crowe Horwath out of the proceeds of the sales of assets belonging to the Funds.  The amounts paid to Weiss and Barnes & Thornburg for the frivolous Turnover/Contempt Motion against Plaintiff and the amount paid to Crowe Horwath to perform work based on the false representation that the Mercury partnership agreement had not been amended, when it was, were a waste of the Funds' assets.

199.    In addition, plaintiff expended approximately $60,000 in legal fees defending against this frivolous and fictitious claim.

**Z.  Weiss' Causing Nutmeg to Engage in Self-Dealing and to Prefer Its Own Interest in Gold Coast to the Detriment of the Interests of Mercury Fund,  Patriot Fund, Fortuna Fund, Michael Fund, October 2005 Fund, Lightning Fund, MiniFund and MiniFund II**

200.    Weiss also breached her fiduciary duties when she first ignored Plaintiff's request that she pursue the claims of Mercury Fund, Patriot Fund, Fortuna Fund, Michael Fund, October 2005 Fund, Lightning Fund, MiniFund and MiniFund II to obtain and sell Gold Coast stock.

201.    Weiss also breached her fiduciary duties when she caused Nutmeg to pursue an opportunity to obtain stock in a company known as Gold Coast the detriment of the rights of Mercury Fund, Patriot Fund, Fortuna Fund, Michael Fund, October 2005 Fund, Lightning Fund, MiniFund and MiniFund II to obtain and sell Gold Coast stock.

202.    Specifically, on June 30, 2008, Mercury Fund, Patriot Fund, Fortuna Fund, Michael Fund, October 2005 Fund, Lightning Fund, MiniFund and MiniFund II received convertible debentures from a company known as Hot Web, Inc.  The face amount of these notes were:  Mercury Fund - $381,054.07;  Patriot Fund - $213,292.26; Fortuna Fund - $112,759.76 , Michael Fund - $42,761.18; October 2005 Fund - 28,462.41; Lightning Fund - $2,799.10; MiniFund - $5,257.92 and MiniFund II - $30,220.07.    On June 30, 2008 Hot Web also gave Nutmeg a convertible debenture in the amount of $627,543.91.  The debentures which Hot Web gave to the foregoing Funds and the debenture which Hot Web gave to Nutmeg all had essentially identical terms, and among various conversion options, permitted the holder to convert the debt into Hot Web stock at a conversion price of $.001 per share.

203.    Thereafter, Hot Web changed its name to Gold Coast.

204.    In early later 2011 and early 2012 the Gold Coast stock price and volume increased significantly.

205.    Beginning approximately February 1, 2012, circumstances made it advantageous for the Funds to convert as large a portion as possible of their respective

debentures from Hot Gold Coast. Because the Funds and Nutmeg are all affiliated companies, and because there were contractual, legal and regulatory restrictions on the amount of free-trading stock in Gold Coast which the Funds and Nutmeg could together hold at any particular time, at most the Funds and Nutmeg could together acquire an amount of free-trading stock that would equal 9.99 percent of the currently issued and outstanding Gold Coast stock. Also, under the terms of the debentures, Nutmeg and the Funds were not even permitted at any given point in time to have issued and unsatisfied conversion notices that sought in excess of 9.99 percent of the then-outstanding Gold Coast stock. Accordingly, Weiss was prohibited from serving a conversion notice on behalf of the Funds for more than approximately 1.49 percent of the then-outstanding Gold Coast stock until Gold Coast honored the notice served on behalf of Nutmeg and Nutmeg sold the resulting stock. However, because Gold Coast elected not to honor the notice, Weiss sent on behalf of Nutmeg, Weiss was restricted from serving a conversion notice on behalf of the Funds for more than 1.49 percent of the outstanding Gold Coast stock.

206. Under the law of fiduciary obligations, if Weiss intended to convert any portion of the Gold Coast debenture held by one of the Funds in a situation that appeared to represent a valuable opportunity, it was required to convert a *pro rata* portion of the Gold Coast debentures held by each of the other Funds so as to not favor any of the Funds over the others with respect to such opportunity. Also, under the law

of fiduciary obligations, Nutmeg was not permitted to pursue an opportunity on its own

behalf to the exclusion of the Funds ability to pursue that opportunity.

207.    The breach of fiduciary obligation is even more apparent when one

considers that the primary source of payment of her fees was from Nutmeg; only in the

event that Nutmeg's funds were not sufficient to defray the payment of her legal fees

was she entitled to seek payment from the Funds. According to paragraph 15 E:

> "The Receiver and Retained Personnel shall apply to the Court for such
> compensation and expense reimbursements on a monthly basis, and such
> amounts shall be paid, in the first instance, from Nutmeg's assets. If these assets
> are not sufficient to pay the Receiver's fees, for good cause shown, the Court may
> order that the Receiver be paid from the Funds' assets."

208.    In early February 2012, several investors contacted Weiss, pointed out the

opportunity represented by the price and volume at which Gold Coast stock was trading

and requested that Weiss convert a portion of the Funds' respective Gold Coast

debentures to stock in order to be able to sell that stock at a time when it was

advantageous to do so.

209.    Weiss, however, did not send Gold Coast a conversion notice on behalf of

all or any of the Funds. Instead, in violation of her and Nutmeg's fiduciary obligations

not to prefer their own interests to those of the Funds, Weiss issued a conversion notice

on behalf of Nutmeg only, which sought to the convert 52,189,840 shares of Gold Coast

stock.  The amount of Gold Coast stock Nutmeg sought to convert was approximately

8.5 percent of the amount then issued and outstanding stock. Since Nutmeg was an

affiliate of each of the Funds this meant that Nutmeg usurped nearly the entire

opportunity that the Funds, as a group of affiliated companies, had to acquire up to 9.99

percent of Gold Coast stock at this opportune time. Weiss did not exercise any

conversion notice whatsoever on behalf of any of the Funds.

210.    If Nutmeg realizes any benefit from its attempt to convert Gold Coast

stock, that benefit will accrue to Weiss and Barnes & Thornburg who, to date, and

without exception have caused the proceeds of the disposition of the Funds' assets

received into Nutmeg's account assets to be paid to themselves and Crowe Horwath,

rather than to the limited partners.

211.    In this fashion, Weiss violated the federal common law and the law of

fiduciary obligations which prohibits investment advisors and fiduciaries from exploiting

limited opportunities to the detriment of their clients' ability to pursue those

opportunities.

## **CLAIMS FOR RELIEF**
[*The following Count relates to a dismissed claim but is set forth herein for the sake of convenience and in order to avoid the risk of waiving any right to appeal*]
**Count I**
**Failure to Disseminate Quarterly Account Statements**
**to the Limited Partners in Violation of §203 of**
**the Investment Advisors Act of 1940**
**(plaintiff individually, and derivatively**
**on behalf of all Funds against Weiss and Nutmeg)**

212.    Paragraphs 1- 212 are repeated and realleged as if set forth fully herein.

214    Prior to April 1, 2010, the SEC Rule 206(4)-2  provided that investment

advisors were either required to themselves send account statements to clients or have

a reasonable basis for believing that a qualified custodian did so, and, if they failed to

do so, they would be deemed to have engaged in "fraudulent, deceptive of manipulative

practice" in violation of §206(a)(4) of the Investment Advisors Act.  Specifically, Rule

206(4)-2:

> If you are an investment adviser registered or required to be registered under section 203 of the Act, it is a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the [Investment Advisors] Act for you to have custody of client funds or securities unless --
>
> * * *
>
> 3. Account statements to clients.
>
> (i) By qualified custodian. You have a reasonable basis for believing that the qualified custodian sends an account statement, at least quarterly, to each of your clients for which it maintains funds or securities, identifying the amount of funds and of each security in the account at the end of the period and setting forth all transactions in the account during that period; or
>
> (ii) By adviser,
> A. You send a quarterly account statement to each of your clients for whom you have custody of funds or securities, identifying the amount of funds and of each security of which you have custody at the end of the period and setting forth all transactions during that period;
>
> * * *
>
> (iii) Special rule for limited partnerships and limited liability companies. If you are a general partner of a limited partnership (or managing member of a limited liability company, or hold a comparable position for another type of pooled investment vehicle), the account statements required under paragraphs (a)(3)(i) or (a)(3)(ii) of this section must be sent to each limited partner (or member or other beneficial owner).

215.     Effective beginning on April 1, 2010, SEC Rule 206(4) removed the

investment advisor's option of providing account statements itself and, instead, required

it to ascertain and ensure (after due inquiry) that the custodians were disseminating

account statements.

> If you are an investment adviser registered or required to be
> registered under section 203 of the Act (15 U.S.C. 80b-3), it is a fraudulent,
> deceptive, or manipulative act, practice or course of business within the
> meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) for you to have
> custody of client funds or securities unless:
> * * *
> (3) Account statements to clients. You have a reasonable basis, after
> due inquiry, for believing that the qualified custodian sends an account
> statement, at least quarterly, to each of your clients for which it maintains
> funds or securities, identifying the amount of funds and of each security in
> the account at the end of the period and setting forth all transactions in
> the account during that period.
> * * *
> (5) Special rule for limited partnerships and limited liability
> companies. If you or a related person is a general partner of a limited
> partnership (or managing member of a limited liability company, or hold a
> comparable position for another type of pooled investment vehicle), the
> account statements required under paragraph (a)(3) of this section must
> be sent to each limited partner (or member or other beneficial owner).

216.     From the time of Weiss' appointment forward, none of the limited partners

received account statements either from Nutmeg or from any of qualified custodian.

217.     Weiss neither caused Nutmeg to send account statements to the limited

partners, caused any qualified custodian to do so nor had any reasonable basis for

believing that a qualified custodian had done so.

218.     Accordingly, Weiss caused Nutmeg to engage in fraudulent, deceptive, or

manipulative act, practice or course of business within the meaning of section 206(4) of the Act.

219.    Section 215(b) of the Investment Advisors Act, 15 U.S.C.A. §80b-15(b), provides:

> Every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

220.    Weiss is a person who "not being a party to the advisory agreements between" Nutmeg and the Funds, "acquired . . . right[s] thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision."

WHEREFORE, plaintiff respectfully requests Judgment in favor of the Funds declaring the advisory agreements between Nutmeg and the Funds to be void and rescinded and enjoining Nutmeg and Weiss from continuing to act as investment advisors to the Funds.

[The following Count relates to a dismissed claim but is set forth herein for the sake of convenience and in order to avoid the risk of waiving any right to appeal]

**Count II**
**Breach of Fiduciary Duty and Violation of the Illinois**

**and Minnesota Limited Partnership Statutes**
**(Plaintiff Individually and Derivatively on**
**Behalf of the Funds in which Plaintiff Invested,**
**Against Weiss and Nutmeg)**

221.    Paragraphs 1- 220 are repeated and realleged as if set forth fully herein.

222.    28 U.S.C. §959 provides: "[A] trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

223.    Each of the Nutmeg Funds is either an Illinois or a Minnesota limited partnership. In both Illinois and Minnesota when a limited partnership's general partner is put into receivership, the general partner is automatically deemed "disassociated from the partnership" unless the receivership order is vacated within 90 days. 805 ILCS 215/603(c) and (d); Minn. Stat. §321.0603(C) and (D).

224.    In both Illinois and Minnesota, for limited partnerships which have only one general partner, the disassociation of that sole general partner will result in the non-judicial dissolution of the partnership as a matter of law unless a "majority of the rights" -- *i.e.*, a majority of the limited partnership interests -- "consent" to the "admission" of a new general partner within another 90 day period. 805 ILCS 215/801(b)(i) and (ii); Minn. Stat. §321.0801(B)(i) and(ii).

225.    In both Illinois and Minnesota, the limited partnership statute provides

that: "(1) Whenever this chapter or a partnership agreement provides for a limited

partner to give or withhold consent to a matter, before the consent is given or withheld,

the limited partnership shall, without demand, provide the limited partner with all

information material to the limited partner's decision that the limited partnership

knows." 805 ILCS 215/304(1); Minn. Stat. §321.0304(1).

226.    Under the Illinois and Minnesota Limited Partnership Statutes, Weiss, on

behalf of each of the Funds, was under an absolute obligation to notify the limited

partners in each Fund that her appointment as the Nutmeg receiver resulted in the

"disassociation" of Nutmeg as general partner of each respective fund, and of their

resulting right to select a new, replacement, general partner based on the consent of the

majority of interests in each fund and that, if they did not do so, each Fund would be

otherwise dissolved as a matter of law.

227.    Weiss directly and intentionally violated the rights of the limited partners

under the Illinois and Minnesota statutes by failing to provide the information which

was necessary for them to choose a new general partner for each Fund and, instead,

retaining the responsibilities of general partner for herself.   In this fashion, Weiss

intentionally deprived the limited partners of the right to select a new general partner

that was triggered upon entry of the receivership order.

228.    No immunity exists for a receiver's violation of state law. Accordingly,

Weiss is liable as a matter of law for failing to comply with the limited partnership law provisions which required her to notify the Funds' limited partners of the disassociation of Nutmeg as the general partner of each Fund (because of the receivership order), and of the resulting right of a majority of the limited partnership interests to admit a new general partner of their own selection.

229.    Weiss also violated the August 6, 2009 order appointing her as receiver since that order specifically provided that she appoint substitute general partners "as needed." The order is consistent with application of the Illinois and Minnesota limited partnership statute, since to the extent substitute general partners were "needed," the order enabled Weiss to facilitate and confirm the admission of a new general partner chosen by the limited partners.

230.    Since each and every act Weiss undertook as receiver was in violation of the limited partners right to select their own general partner, Weiss is responsible for all damages that incurred to the Funds as a result of her receivership.

WHEREFORE, plaintiff respectfully requests Judgment in favor of the Funds and in their own favor and against Weiss as follows:

A.  Declaring that Weiss is disqualified from any statutory or common law immunity or qualified immunity under either federal or state law; requiring disgorgement of any compensation Weiss received; and awarding compensatory damages in the amount of any professional compensation Weiss authorized or caused

Nutmeg to pay, compensatory damages in an amount equal to the decline of the value

of the individual plaintiff's investments from the value of those investments at the time

of Weiss' appointment to the time of trial; compensatory damages equal to the value of

the lost opportunities described herein, in an amount to be determined at trial but in

any event no less than $25,000,000; and punitive damages in an amount to be

determined at trial.

    B.   Costs and attorneys' fees by law;

    C.   Pre-judgment interest; and

    D.   Such further relief as the Court deems just under the circumstances.

[The following Count relates to a dismissed claim but is set forth herein for the sake of
convenience and in order to avoid the risk of waiving any right to appeal]
**Count III**
**Breach of Fiduciary Duty: Failing to Hire a Qualified Fund**
**Manager or Investment Advisor to Operate the Funds**
**(By Plaintiff Individually and Derivatively on**
**Behalf of the Funds in which Plaintiff Invested -**
**Against Weiss and Nutmeg)**

231.    Paragraphs 1- 230 are repeated and realleged as if set forth fully herein.

232.    Under rules promulgated by the SEC, rules promulgated by the Illinois

state securities regulators and the case law, investment advisors and fund managers

owe fiduciary duties to their clients.

233.    Under Illinois and Minnesota law, general partners of limited partnerships

and the persons who exercise legal and/or *de facto* control of such general partners owe

fiduciary duties to the limited partners.

234.    Weiss and Nutmeg were subject to the fiduciary duties of care and loyalty, as well as the following duties which are imposed upon investment advisors: (1) to put clients' interests first; (2) to act with utmost good faith; (3) to provide full and fair disclosure of all material facts; (4) to refrain from misleading clients; and (5) to expose all conflicts of interest to clients.

235.    Weiss and Nutmeg breached these fiduciary duties by failing to notify the limited partners in each Fund that (1) her appointment as the Nutmeg receiver resulted in the "disassociation" of Nutmeg as general partner of each respective Fund, and granted them the right to select a new, replacement, general partner based on the consent of the majority of interests in each Fund and that, (2) if they did not do so, each Fund would be otherwise dissolved as a matter of law.

236.    Weiss and Nutmeg breached their fiduciary duties by failing to select a competent investment advisor or to assist the limited partners in selecting a replacement general partner.

237.    Since Weiss had no background or training as a fund manager or investment advisor and had no familiarity with PIPE assets, she was not qualified to operate the funds without professional assistance from a trained investment advisor with appropriate background and training.

238.    By usurping the limited partners' right to admit a new general partner and attempting to operate the Funds herself, Weiss breached her fiduciary duty and her duty

under the receivership order to ensure that the Funds were operated and managed by persons who were competent to do so.

239.    For the foregoing reasons, plaintiff is entitled to a declaratory judgment that Weiss is disqualified from any statutory or common law immunity or qualified immunity under either federal or state law, disgorgement of any compensation Weiss received, disgorgement of any professional compensation Weiss authorized or professional fees paid by Nutmeg in pursuit of Weiss' directives. Plaintiff is also entitled to money damages in an amount equal to the decline of the value of their investments in Nutmeg from the value of those investments at the time of Weiss' appointment to the present and for recoupment of the lost opportunities that a competent funds manager would have been able to advantageously exploit.

WHEREFORE, plaintiff respectfully requests Judgment in favor of the Funds and in their own favor and against Weiss as follows:

A.  Declaring that Weiss is disqualified from any statutory or common law immunity or qualified immunity under either federal or state law; requiring disgorgement of any compensation Weiss received; and awarding compensatory damages in the amount of any professional compensation Weiss authorized or caused Nutmeg to pay, compensatory damages in an amount equal to the decline of the value of the plaintiff's investments from the value of those investments at the time of Weiss' appointment to the time of trial; compensatory damages equal to the value of the lost

opportunities described herein in an amount to be determined at trial but in any event

no less than $25,000,000; and punitive damages in an amount to be determined at trial;

 B.  Costs and attorneys' fees by law;

 C.  Pre-judgment interest; and

 D.  Such further relief as the Court deems just under the circumstances.

<strong>Count IV<br>
Breach of Fiduciary Duty: Paying Crowe Horwath Fees in Excess of the<br>
Fee Cap Imposed by the Court and Without Court Approval<br>
(By Plaintiff Individually and Derivatively on<br>
Behalf of the Funds in which Plaintiff Invested,<br>
Against Weiss and Nutmeg)</strong>

240.  Paragraphs 1- 239 are repeated and realleged as if set forth fully herein.

241.  As receiver, Weiss also owed the parties in the *SEC v. Nutmeg* action a

duty of neutrality and could not favor one party over the other.

242.  As receiver Weiss had a duty to preserve, for the benefits of the claimants,

a duty that must be undertaken without bias to one side or the other.

243.  As receiver, Weiss had a duty to comply with all rulings and orders in the

*SEC v. Nutmeg* case, even when to do so does not favor the SEC's case.

244.  Weiss violated her obligations to comply with all rulings and orders in the

*SEC v. Nutmeg* case when she paid Crowe Horwath fees in excess of the $150,000 fee

cap without seeking modification of that cap, or authorization for the expenditure of

additional fees and failed to submit Crowe Horwath's estimate of additional fees to the

Court for approval.

245.     Weiss violated her obligation of neutrality by authorizing Crowe Horwath to investigate the SEC's disgorgement allegations without Court approval.

246.     As an officer of the Court Weiss was required to comply with the order capping Crowe Horwath's fees and her intentional failure to do represented legal malpractice.

247.     Plaintiff was injured in his business and property by the foregoing breach of fiduciary duties.

  WHEREFORE, plaintiff respectfully requests Judgment in favor of all the Funds or, alternatively, in his own favor as follows:

A.  Compensatory damages in an amount to be determined at trial but in any event no less than $260,000 against Weiss and Nutmeg and punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs allowable by law;

C.  Pre-judgment interest; and

D.  Such further relief as the Court deems just under the circumstances.

**Count V**
**Breach of Fiduciary Duty and Legal Malpractice:**
**<u>Failure to Collect or Settle the Judgment Against RMD</u>**
**(By Plaintiff individually**
**and derivatively on behalf of Michael Fund**
**and October 2005 Fund, Against**
**Weiss, Nutmeg and Barnes & Thornburg)**

248.     Paragraphs 1 - 247 are repeated and realleged as if set forth fully herein.

249.    A fiduciary relationship exists between an attorney and a client, and the attorney owes the client the utmost fidelity, honesty, and good faith.

250.    As receiver, Weiss was a fiduciary of all persons who had interest in the property subject to her receivership.

251.    A receiver is subject to fiduciary duties of care and loyalty.

252.    In accepting the appointment as receiver, Weiss impliedly represented that she had the special skills necessary to operate a business, such as the Funds in this case, which is invested in PIPE assets.

253.    Weiss knew or ought to have known that plaintiff was relying upon her skill and judgment.

254.    Weiss was subject to a duty of care, competence, and skill in performing all aspects of operation of the Funds.

255.    Weiss was required to exercise reasonable skill and ordinary diligence as may fairly be expected from a person in her situation.

256.    Weiss lacked proper authority to decide not to attempt to collect or settle the judgment against RMD.

257.    Weiss willfully and deliberately breached her fiduciary duties to the Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those funds by failing to collect or settle, or attempt to collect or settle, the judgment against RMD.

258.    Weiss was grossly negligent and reckless in the discharge of her duties to plaintiff in failing to collect, settle or attempt to collect or settle the judgment against RMD.

259.    Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those Funds were injured in their business and property as a result of Weiss' breach of her fiduciary duties.

260.    Weiss had no legal right to decide not to attempt to collect or settle the RMD judgment and by failing to notify the limited partners of the Funds of their right to select a new general partner in accordance with the limited partnership statute she wrongfully usurped decision-making authority for herself.

261.    Had Weiss attempted to collect or settle the judgment against RMD she would have succeeded in doing so.

262.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to represent the legal interests of Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those Funds.

263.    A fiduciary relationship exists between an attorney and a client, and the attorney owes the client the utmost fidelity, honesty, and good faith.

264.    A lawyer is required to abide by a client's decisions concerning the objectives of representation, and consult with the client regarding the means by which they are to be pursued. Without the client's consent, the intentional dismissal of a cause

of an action is malpractice as a matter of law. Without the client's consent, a decision to abandon a viable cause of action or to fail to explore possible means for collecting on a judgment is malpractice as a matter of law. A lawyer is required to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those Funds could not effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing to notify the limited partners of those Funds of their right to select a new general partner, Weiss wrongfully usurped all decision making authority for herself.

265. Weiss and Barnes & Thornburg failed to meet the standard of care for lawyers in the community, and but for their malpractice, Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those Funds would not have suffered the losses described herein.

266. Weiss and Barnes & Thornburg committed legal malpractice by failing to collect or settle or even attempt to collect or settle the judgment against RMD.

267. Michael Fund and October 2005 Fund and the Plaintiff as a limited partner in those Funds were injured in their business and property as a result of the legal malpractice by Weiss and Barnes & Thornburg.

WHEREFORE, the plaintiff, as a limited partners in Michael Fund respectfully request Judgment in favor of Michael Fund or, alternatively, in his own favor, as follows

A. Compensatory damages in an amount to be determined at trial but no less than $2,450,000 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs allowable by law;

C.  Pre-judgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

- and -

WHEREFORE, the plaintiff, as a limited partner in October 2005 Fund respectfully request Judgment in favor of October 2005 Fund or, alternatively, in his own favor, as follows:

A. Compensatory damages in an amount to be determined at trial but no less than $650,000 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs allowable by law;

C.  Pre-judgment interest; and

D.  Such further relief as the Court deems just under the circumstances.

### Count VI
### Breach of Fiduciary Duty: Failing to Convert the Remaining
### Portion of GoIP's Debt to Mercury Fund
### (By Plaintiff
### individually and on behalf of Mercury Fund,
### Against Weiss and Nutmeg)

268.    Paragraphs 1 - 267 are repeated and realleged as if set forth fully herein.

269.    Weiss willfully and deliberately breached her fiduciary duties to plaintiff in

failing convert the remaining portion of the GoIP debenture in reasonable manner.

270.     Weiss was grossly negligent and reckless in the discharge of her duties to plaintiff in failing to convert the remaining portion of the GoIP note in a reasonable manner.

271.     Weiss had no legal right to decide not to attempt to manage any of Mercury Funds assets since, by failing to notify the limited partners of Mercury Fund of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision-making authority for herself.

272.     Had Weiss converted the remaining portion of the GoIP note at a reasonable time, Mercury Fund would have received substantial profits.

273.     Mercury Fund and the Plaintiff as a limited partner in Mercury Fund were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

WHEREFORE, the Plaintiff as a limited partner in Mercury Fund respectfully request Judgment in favor of Mercury Fund or, alternatively, in their own favor, as follows:

A.     Compensatory damages in an amount to be determined at trial but no less than $920,000 and punitive damages against Weiss and Nutmeg in an amount to be determined at trial.

B.     Costs and attorneys' fees by law;

C.     Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count VII**
**Breach of Fiduciary Duty and Legal Malpractice:**
**Failure to Pursue Fortuna Fund's**
**Claims Against Sanswire**
**(By Plaintiff individually**
**and derivatively on behalf of Fortuna Fund, Against**
**Weiss, Nutmeg and Barnes & Thornburg)**

274.   Paragraphs 1 - 273 are repeated and realleged as if set forth fully herein.

275.   Weiss willfully and deliberately breached her fiduciary duties to Fortuna Fund and the Plaintiff as a limited partner in Fortuna Fund in failing pursue Fortuna Fund's claims against Sanswire.

276.   Weiss was grossly negligent and reckless in failing pursue Fortuna Funds claims against Sanswire.

277.   Weiss had no legal right to manage any of Fortuna Fund's assets since, by failing to notify the limited partners in Fortuna Fund of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision making authority for herself.

278.   Had Weiss pursued Fortuna Funds' claims against Sanswire, Fortuna Fund would have obtained satisfaction or partial satisfaction of those claims.

279.   Fortuna Fund and the plaintiff, as a limited partner in Fortuna Fund were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

280.     Weiss and Barnes & Thornburg specifically owed and undertook a duty to represent the legal interests of Fortuna Fund and the Plaintiff as a limited partner in those Funds.

281.     Fortuna Fund and the Plaintiff as a limited partner in Fortuna Fund could not effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing to notify the limited partners of Fortuna Fund of their right to select a new general partner, Weiss wrongfully usurped all decision making authority for herself.

282.     Weiss and Barnes & Thornburg failed to meet the standard of care for lawyers in the community and, but for their malpractice, Fortuna Fund and the Plaintiff as a limited partner in those Funds would not have suffered the losses described herein.

283.     Weiss and Barnes & Thornburg committed legal malpractice by failing to pursue Fortuna Funds claims against Sanswire.

284.     Fortuna Fund and the Plaintiff as a limited partner in Fortuna Fund were injured in their business and property as a result of the legal malpractice by Weiss and Barnes & Thornburg.

WHEREFORE, the Plaintiff as a limited partner in Patriot Fund respectfully requests Judgment in favor of Patriot Fund or, alternatively, in his own favor, as follows:

A.  Compensatory damages in an amount to be determined at trial but no less than $120,000 against Weiss, Nutmeg and Barnes & Thornburg and of punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B.   Costs and attorneys' fees by law;

C.   Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count VIII**
**Breach of Fiduciary Duty:**
**Failure to Convert the Debt which Secured Financial Owed**
**Patriot Fund and Failure to Sell Patriot Fund's Stock**
**In Secured Financial in a Timely Fashion**
**(By Plaintiff as a limited partner in Patriot Fund individually**
**and derivatively on behalf of Patriot Fund,**
**Against Weiss and Nutmeg)**

285.   Paragraphs 1 - 284 are repeated and realleged as if set forth fully herein.

286.   Weiss willfully and deliberately breached her fiduciary duties to Patriot

Fund and the Plaintiff as a limited partner in Patriot Fund by failing to convert the debt

the Secured Financial owed Patriot Fund to stock and by failing to sell Patriot's Stock in

Secured Financial in a timely fashion.

287.   Weiss was grossly negligent and reckless in failing to convert the debt the

Secured Financial owed Patriot Fund to stock and in failing to sell Patriot's Stock in

Secured Financial in a timely fashion.

288.   Weiss had no legal right to manage any of Patriot Funds' assets since, by

failing to notify the limited partners in Patriot Fund of their right to select a new general

partner in accordance with the limited partnership statute, she wrongfully usurped

decision making authority for herself.

289.   Had Weiss converted Patriot Funds' convertible debenture from Secured

Financial in a reasonable manner, Patriot Fund would have received substantial profits.

290.    Patriot Fund and the Plaintiff as a limited partner in Patriot Fund were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

WHEREFORE, the Plaintiff as a limited partner in Patriot Fund respectfully requests Judgment in favor of Patriot Fund or, alternatively, in his own favor, as follows:

A.  Compensatory damages in an amount to be determined at trial, but no less than $705,000, and punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs and attorneys' fees by law;

C.  Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count IX**
**Breach of Fiduciary Duty, Aiding and**
**Abetting the Breach of Fiduciary**
**Duties and Legal Malpractice**
**Termination of and Interference with Advantageous INverso**
**Agreement Which Had Been Concluded by Nutmeg on**
**Behalf of Mercury, Fortuna and Patriot Funds and**
**For the Benefit of the Tropical Fund, MiniFund,**
**MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund,**
**Startech Fund, Lightning Fund I and Image Globe Fund**
**(By Plaintiff as a limited partner in Mercury, Fortuna, Patriot Fund, Tropical**
**Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund,**
**Adzone Fund, Startech Fund, Lightning Fund I and Image Globe**
**Fund individually and derivatively on behalf of the foregoing**
**Funds, Against Weiss, Nutmeg and Barnes & Thornburg)**

291.    Paragraphs 1 - 290 are repeated and realleged as if set forth fully herein.

292.    Weiss willfully and deliberately breached her fiduciary duties to Mercury, Fortuna, Patriot Funds, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund Patriot Fund and the Plaintiff as a limited partner in the foregoing Funds by terminating and interfering with the advantageous agreement involving INverso, Felder and Hartman as described herein.

293.    Weiss was grossly negligent and reckless in terminating and interfering with the advantageous agreement involving INverso, Felder and Hartman as described herein.

294.    Weiss had no legal right to manage any of the assets belonging to Mercury, Fortuna, Patriot Fund, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund since, by failing to notify the limited partners in Patriot Fund of their right to select a new general partner in accordance with the limited partnership statutes, she wrongfully usurped decision making authority for herself.

295.    Had Weiss not terminated or interfered with the advantageous transaction involving INverso, Felder and Hartman, Mercury Fund, Fortuna Fund, Patriot Fund, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund and the limited partners in these

Funds would have obtained substantial profits.

296.    Mercury Fund, Fortuna Fund, Patriot Funds, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund Patriot Fund the limited partners in these Funds have been injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

297.    Barnes & Thornburg aided and abetted Weiss' breach of her fiduciary duties and committed legal malpractice by falsely representing to the Court that Weiss had objected to the INverso transaction prior to September 9, 2009, when in fact she had not.

298.    But for Barnes & Thornburg's assisting Weiss in breaching her fiduciary duties and its own malpractice, the Funds would not have suffered the losses described herein.

299.    Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, October 2005 Fund and Lightning Fund I and Image Globe Fund are entitled to a declaratory judgment that Nutmeg acquired all or part of its INverso stock in trust for and for the benefit of those trusts and their limited partners.

WHEREFORE, the Plaintiff as a limited partner in Mercury, Fortuna, Patriot Fund, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund, Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund respectfully requests Judgment in favor of

Mercury, Fortuna, Patriot Fund, Tropical Fund, MiniFund, MiniFund II, Nanobac Fund,

Michael Fund, Adzone Fund, Startech Fund, Lightning Fund I and Image Globe Fund or,

alternatively, in favor of themselves, as follows:

A.  Compensatory damages in an amount to be determined at trial but no less

than $45,000,000 against Weiss, Nutmeg and Barnes & Thornburg and punitive

damages in an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs and attorneys' fees by law;

C.  Prejudgment interest; and

D.  Such further relief as the Court deems just under the circumstances.

**Count X**
**Breach of Fiduciary Duty and Legal Malpractice:**
**Failure to Prosecute Nutmeg/Nanobac Fund's**
**Valuable Claims Against Nanobac**
**(By Plaintiff as a limited partner in Nanobac Fund individually**
**and derivatively on behalf of Nanobac Fund,**
**Against Weiss, Nutmeg and Barnes & Thornburg)**

300.    Paragraphs 1 - 299 are repeated and realleged as if set forth fully herein.

301.    Weiss willfully and deliberately breached her fiduciary duties to Nanobac

Fund and the Plaintiff as a limited partner in Nanobac Fund by failing to pursue

Nanobac Fund's claims against Nanobac.

302.    Weiss was grossly negligent and reckless in failing pursue Nanobac Fund's

claims against Nanobac.

303.    Weiss had no legal right to manage any of Nanobac Fund's assets since,

by failing to notify the limited partners in Nanobac Fund of their right to select a new

general partner in accordance with the limited partnership statute, she wrongfully

usurped decision-making authority for herself.

304.    Had Weiss pursued Nanobac Fund's claims against Nanobac, Nanobac

Fund would have succeeded in receiving satisfaction or partial satisfaction of those

claims.

305.    Nanobac Fund and the Plaintiff as a limited partner in Nanobac Fund were

injured in their business and property by Weiss' breach of her fiduciary duties as

described herein.

306.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to

represent the legal interests of Nanobac Fund and the Plaintiff as a limited partner in

those Funds.

307.    Nanobac Fund and the Plaintiff as a limited partner in those Funds could

not effectively consent to the actions of Weiss and Barnes & Thornburg because, by

failing to notify the limited partners of Nanobac Fund of their right to select a new

general partner, Weiss wrongfully usurped all decision making authority for herself.

308.    Weiss and Barnes & Thornburg failed to meet the standard of care for

lawyers in the community and, but for their malpractice, Nanobac Fund and the Plaintiff

as a limited partner in Nanobac Fund would not have suffered the losses described

herein.

309. Weiss and Barnes & Thornburg committed legal malpractice by failing to pursue Nanobac Fund's claims against Nanobac.

310. Nanobac Fund and the Plaintiff as a limited partner in Nanobac Fund were injured in their business and property as a result of the legal malpractice by Weiss and Barnes & Thornburg.

WHEREFORE, the Plaintiff as a limited partner in Nanobac Fund respectfully requests Judgment in favor of Nanobac Fund or, alternatively, in his own favor as follows:

A. Compensatory damages in an amount to be determined at trial but no less than $6,000,000 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in an amount to be determined at trial against Weiss and Nutmeg;

B. Costs and attorneys' fees by law;

C. Prejudgment interest; and

D. Such further relief as the Court deems just under the circumstances.

**Count XI**
**Breach of Fiduciary Duty:**
**The Failure to Enforce Mercury Fund's**
**Rights Against North Bay Resources, Inc.**
**(By Plaintiff as a limited partner in Mercury Fund**
**individually and on behalf of Mercury Fund,**
**Against Weiss and Nutmeg)**

311. Paragraphs 1 - 310 are repeated and realleged as if set forth fully herein.

312. Weiss willfully and deliberately breached her fiduciary duties to Mercury Fund and the Plaintiff as a limited partner in Mercury Fund by failing to attempt to

convert or enforce the debt that North Bay Resources Inc. owed Mercury Fund.

313.   Weiss was grossly negligent and reckless in failing to convert or enforce the debt that North Bay Resources Inc. owed Mercury Fund to stock and thereafter sell Mercury's Stock in North Bay Resources, Inc. in a timely fashion.

314.   Weiss had no legal right to manage any of Mercury Fund's assets since, by failing to notify the limited partners in Mercury Fund of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision-making authority for herself.

315.   Had Weiss attempted to convert or enforce Mercury Fund's convertible debenture from North Bay Resources, Inc. in a reasonable manner, Mercury Fund would have received substantial profits.

316.   Mercury Fund and the plaintiff as a limited partner in Mercury Fund were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

WHEREFORE, the Plaintiff as a limited partner in Mercury Fund respectfully requests judgment in favor of Mercury Fund or, alternatively, in favor of themselves, as follows:

A.  Compensatory damages against Weiss and Nutmeg in an amount to be determined at trial but no less than $50,000 and punitive damages against Weiss and Nutmeg in an amount to be determined at trial;

B.  Costs and attorneys' fees by law;

C.    Prejudgment interest; and

D.    Such further relief as the Court deems just under the circumstances.

## Count XII
## Breach of Fiduciary Duty and Legal Malpractice:
## Failure to Complete The Freedman Settlement
## (By Plaintiff as a limited partner in Mercury Fund
## individually and on behalf of Mercury Fund, Against
## Weiss, Nutmeg and Barnes & Thornburg)

317.    Paragraphs 1 - 316 are repeated and realleged as if set forth fully herein.

318.    Weiss willfully and deliberately breached her fiduciary duties to Mercury Fund and the Plaintiff as a limited partner in Mercury Fund in failing enforce Mercury Fund's settlement with Freedman and voluntarily dismissing the suit against Freedman.

319.    Weiss was grossly negligent and reckless in failing pursue Mercury Fund's settlement with Freedman and failing to obtain a confession of judgment from Freedman.

320.    Weiss had no legal right to manage any of Mercury Fund's assets since, by failing to notify the limited partners in Mercury Fund of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision making authority for herself.

321.    Had Weiss attempted to enforce Mercury Fund's settlement with Freedman, she would have succeeded in doing so.

322.    Mercury Fund and the Plaintiff as a limited partner in Mercury Fund were

injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

323.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to represent the legal interests of Mercury Fund and the Plaintiff as a limited partner in those Funds.

324.    Mercury Fund and the Plaintiff as a limited partner in those Funds could not effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing to notify the limited partners of Mercury Fund of their right to select a new general partner, Weiss wrongfully usurped all decision-making authority for herself.

325.    Weiss and Barnes & Thornburg failed to meet the standard of care for lawyers in the community and, but for their malpractice, Mercury Fund and the Plaintiff as a limited partner in Mercury fund would have received the full benefit of the settlement with Freedman.

326.    Weiss and Barnes & Thornburg committed legal malpractice by failing to pursue Mercury Fund's settlement with Freedman, failing to obtain a confession of judgment from Freedman, giving Freedman a general release and failing to attend court conferences and hearings.

327.    Mercury Fund and the Plaintiff as a limited partner in Mercury Fund were injured in their business and property as a result of the legal malpractice by Weiss and Barnes & Thornburg.

WHEREFORE, the Plaintiff as a limited partner in Mercury Fund respectfully requests

Judgment in favor of Mercury Fund or, alternatively, in his own favor, as follows:

A.  Compensatory damages in an amount to be determined at trial but no less

than $38,500 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in

an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs and attorneys' fees by law;

C.  Prejudgment interest: and

D.   Such further relief as the Court deems just under the circumstances.

**Count XIII**
**Breach of Fiduciary Duty and Legal Malpractice:**
**Failure to Collect or Settle, or to Attempt to Collect or Settle the**
**Judgment that Financial Alchemy Had Obtained on Behalf**
**of Lightning Fund I in the *Solar Night* Case**
**(By Plaintiff as a limited partner in Lightning Fund I**
**individually and on behalf of Lightning Fund I,**
**Against Weiss, Nutmeg and Barnes & Thornburg)**

328.    Paragraphs 1 - 327 are repeated and realleged as if set forth fully herein.

329.    Weiss willfully and deliberately breached her fiduciary duties to Lightning

Fund I and the Plaintiff as a limited partner in Lightning Fund I in failing to collect or

settle or attempt to collect or settle Lightning Fund I's judgment against Solar Night.

330.    Weiss was grossly negligent and reckless in the discharge of her duties to

plaintiff in failing to collect, settle or attempt to collect or settle the judgment against

Solar Night.

331.    Weiss had no legal right to manage any of Lightning Fund I's assets since,

by failing to notify the limited partners in Lightning Fund I of their right to select a new

general partner in accordance with the limited partnership statute, she wrongfully

usurped decision-making authority for herself.

332.    Had Weiss attempted to collect or settle Lightning Fund I's judgment

against Solar Night, she would have succeeded in doing so.

333.    Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I

were injured in their business and property by Weiss' breach of her fiduciary duties as

described herein.

334.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to

represent the legal interests of Lightning Fund I and the Plaintiff as a limited partner in

Lightning Fund I.

335.    Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I

could not effectively consent to the actions of Weiss and Barnes & Thornburg because,

by failing to notify the limited partners in Lightning Fund I of their right to select a new

general partner, Weiss wrongfully usurped all decision-making authority for herself.

336.    Weiss and Barnes & Thornburg failed to meet the standard of care for

lawyers in the community and, but for their malpractice, Lightning Fund I and the

Plaintiff as a limited partner in Lightning Fund I would not have suffered the losses

described herein.

337.    Weiss and Barnes & Thornburg committed legal malpractice by failing to

collect or settle, or attempt to settle, Lightning Fund I's judgment against Solar Night.

338.     Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I

were injured in their business and property as a result of the legal malpractice by Weiss

and Barnes & Thornburg.

WHEREFORE, the Plaintiff as a limited partner in Lightning Fund I respectfully requests

Judgment in favor of Lightning Fund I or, alternatively, in his own favor as follows:

A.  Compensatory damages in an amount to be determined at trial but no less

than $100,000 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in

an amount to be determined at trial against Weiss and Nutmeg;

B.  Costs and attorneys' fees by law;

C.  Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count XIV**
**Breach of Fiduciary Duty and Legal Malpractice:**
**Abandoning the Claim Financial Alchemy Was Prosecuting on**
**behalf of Lightning Fund I in the *Asia America Petroleum* Case**
**(By Plaintiff as a limited partner in Lightning Fund I**
**individually and on behalf of Lightning Fund I, Against**
**Weiss, Nutmeg and Barnes & Thornburg)**

339.     Paragraphs 1 - 338 are repeated and realleged as if set forth fully herein.

340.     Weiss willfully and deliberately breached her fiduciary duties to Lightning

Fund I and the Plaintiff as a limited partner in Lightning Fund I in failing pursue

Lightning Fund I's claims against Asia America Petroleum and Chirico.

341.    Weiss was grossly negligent and reckless in failing pursue Lightning Fund I's claims against Asia America Petroleum and Chirico.

342.    Weiss had no legal right to manage any of Lightning Fund I's assets since, by failing to notify the limited partners in Lightning Fund I of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision-making authority for herself.

343.    Had Weiss pursued Lightning Fund I's claims against Asia America Petroleum, Inc. and Chirico, Lightning Fund I would have succeeded in receiving satisfaction or partial satisfaction of those claims.

344.    Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

345.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to represent the legal interests of Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I.

346.    Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I could not effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing to notify the limited partners of Lightning Fund I of their right to select a new general partner, Weiss wrongfully usurped all decision making authority for herself.

347.    Weiss and Barnes & Thornburg failed to meet the standard of care for

lawyers in the community and, but for their malpractice Lightning Fund I and the

Plaintiff as a limited partner in Lightning Fund I would not have suffered the losses

described herein.

348.    Weiss and Barnes & Thornburg committed legal malpractice by failing to

pursue Lightning Fund I's Asia America Petroleum and Chirico.

349.    Lightning Fund I and the Plaintiff as a limited partner in Lightning Fund I

were injured in their business and property as a result of the legal malpractice by Weiss

and Barnes & Thornburg.

WHEREFORE, plaintiff as a limited partner in Lightning Fund I respectfully requests

Judgment in favor of Lightning Fund I or, alternatively, in his own favor, as follows:

A.   Compensatory damages in an amount to be determined at trial but no less

than $229,837 against Weiss, Nutmeg and Barnes & Thornburg and punitive damages in

an amount to be determined at trial against Weiss and Nutmeg;

B.   Costs and attorneys' fees by law;

C.   Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count XV**
**Breach of Fiduciary Duty:**
**Weiss' Failure to Attempt to Negotiate With the SEC to**
**Withdraw its Opposition to the ViviCells/Tropical Beverage,**
**Inc. Reorganization Plan and Failure to Participate in**
**the Efforts to Achieve a Reorganization Plan that**
**<u>Would Have Benefitted Mercury Fund and Tropical Fund</u>**
**(By Plaintiff as a limited partner in Mercury Fund individually**

**and on behalf of Mercury Fund and by the limited partners
in Tropical Fund individually and on behalf of Tropical Fund,
Against Weiss and Nutmeg)**

350.    Paragraphs 1- 349 are repeated and realleged as if set forth fully herein.

351.    Weiss willfully and deliberately breached her fiduciary duties to Mercury Fund and the Plaintiff as a limited partner in Lightning Fund I and Tropical Fund and the Plaintiff as a limited partner in Tropical Fund in failing to respond to and address the SEC's objection to the Vivicells reorganization plan proposed by Nutmeg on behalf of Mercury Fund and Tropical Fund.

352.    Weiss was grossly negligent and reckless in failing to respond to and address the SEC's objection to the Vivicells reorganization plan proposed by Nutmeg on behalf of Mercury Fund and Tropical Fund.

353.    Weiss had no legal right to manage any assets belonging to Mercury Fund or Tropical Fund since, by failing to notify the limited partners in Mercury Fund and Tropical Fund of their right to select a new general partner in accordance with the limited partnership statute, she wrongfully usurped decision-making authority for herself.

354.    Had Weiss responded to the SEC's objection to the Vivicells reorganization plan which Nutmeg had proposed on behalf of Mercury Fund and Tropical Fund, a compromise and satisfaction of the SEC objection would have been achieved.

355.    Had Weiss actively pursued a plan of reorganization in the Vivicells

bankruptcy, rather than merely abandoning those efforts, a reorganization beneficial to Mercury Fund and Michael Fund would have been achieved.

356.    Mercury Fund and the Plaintiff as a limited partner in Mercury Fund and Tropical Fund and the Plaintiff as a limited partner in Tropical Fund were injured in their business and property by Weiss' breach of her fiduciary duties as described herein. WHEREFORE, the Plaintiff as a limited partner in Mercury Fund requests Judgment in favor of Mercury Fund or, alternatively, in his own favor, and Plaintiff as a limited partner in Tropical Fund request judgment in favor of Tropical Fund or, alternatively, in his own favor as follows:

A.  Compensatory damages against Weiss and Nutmeg in an amount to be determined at trial but no less than $200,000 and punitive damages in an amount to be determined at trial;

B.  Costs and attorneys' fees by law;

C.  Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count XVI**
**Breach of Fiduciary Duty and Legal Malpractice:**
**Failure to Collect or Settle or Attempt to Collect the Judgment**
**that Financial Alchemy Had Obtained on Behalf**
**of MiniFund II against Robert Talbot**
**(By Plaintiff as a limited partner in MiniFund II individually**
**and on behalf of MiniFund II, Against**
**Weiss, Nutmeg and Barnes & Thornburg)**

357.    Paragraphs 1- 356 are repeated and realleged as if set forth fully herein.

358.    Weiss willfully and deliberately breached her fiduciary duties to MiniFund II
and the Plaintiff as a limited partner in MiniFund II in failing to collect or settle or
attempt to collect or settle MiniFund II's judgment against Talbot.

359.    Weiss was grossly negligent and reckless in failing pursue negligent and
reckless in the discharge of her duties to plaintiff in failing to collect, settle or attempt to
collect or settle the judgment against Talbot.

360.    Weiss had no legal right to manage any of MiniFund II's assets since, by
failing to notify the limited partners in MiniFund II of their right to select a new general
partner in accordance with the limited partnership statute, she wrongfully usurped
decision making authority for herself.

361.    Had Weiss attempted to collect or settle MiniFund II's judgment against
Talbot, she would have succeeded in doing so.

362.    MiniFund II and the Plaintiff as a limited partner in MiniFund II were
injured in their business and property by Weiss' breach of her fiduciary duties as
described herein.

363.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to
represent the legal interests of MiniFund II and the Plaintiff as a limited partner in Mini
Fund II.

364.    MiniFund II and the Plaintiff as a limited partner in MiniFund II could not
effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing

to notify the limited partners in MiniFund II of their right to select a new general partner,

Weiss wrongfully usurped all decision-making authority for herself.

365.    Weiss and Barnes & Thornburg failed to meet the standard of care for

lawyers in the community and, but for their malpractice, MiniFund II Fund and the

Plaintiff as a limited partner in MiniFund II would not have suffered the losses described

herein.

366.    Weiss and Barnes & Thornburg committed legal malpractice by failing to

collect or settle, or attempt to settle, MiniFund II's judgment against Talbot.

367.    MiniFund II and the Plaintiff as a limited partner in MiniFund II were

injured in their business and property as a result of the legal malpractice by Weiss and

Barnes & Thornburg.

WHEREFORE, the Plaintiff as a limited partner in MiniFund II respectfully requests

judgment in favor of MiniFund II or, alternatively, in his own favor as follows:

A.    Compensatory damages in an amount to be determined at trial but no less

than $955,124.31 against Weiss, Nutmeg and Barnes & Thornburg and punitive

damages in an amount to be determined at trial against Weiss and Nutmeg

B.    Costs and attorneys' fees by law;

C.    Prejudgment interest; and

D.    Such further relief as the Court deems just under the circumstances.

**Count XVII**

**Breach of Fiduciary Duty**
**Failure to Convert the Debentures**
**Received from Mike the Pike**
**(By Plaintiff as a limited partner**
**individually and derivatively on behalf of**
**October 2005 Fund and**
**Michael Fund,**
**Against Weiss and Nutmeg)**

368.    Paragraphs 1- 367 are repeated and realleged as if set forth fully herein.

369.    Weiss willfully and deliberately breached her fiduciary duties to plaintiff by failing convert the debentures received from Mike the Pike.

370.    Weiss was grossly negligent and reckless in the discharge of her duties to plaintiff in failing to convert the remaining portion of the Mike the Pike debentures in a reasonable manner.

371.    Weiss had no legal right to decide not to attempt to manage any assets of October 2005 Fund or Michael Fund since,  by failing to notify the limited partners in these Funds of their right to select new general partners in accordance with the limited partnership statute, she wrongfully usurped decision-making authority for herself.

372.    Had Weiss converted the remaining portion of the debentures received from Mike the Pike in a reasonable time, October 2005 Fund and Michael Fund would have received substantial profits.

373.    October 2005 Fund and the Plaintiff as a limited partner in October 2005 Fund and Michael Fund and the Plaintiff as a limited partner in Michael Fund were injured in their business and property by Weiss' breach of her fiduciary duties as

described herein.

WHEREFORE, the plaintiff as a limited partner in October 2005 Fund respectfully requests Judgment in favor of October 2005 Fund or, alternatively, in his own favor, as follows:

    A.  Compensatory damages against Weiss and Nutmeg in an amount to be determined at trial but no less than $200,000 and punitive damages against Weiss and Nutmeg in an amount to be determined at trial;

.    B.  Costs and attorneys' fees by law;

    C.  Prejudgment interest; and

    D.  Such further relief as the Court deems just under the circumstances.

- and -

WHEREFORE, the Plaintiff as a limited partner in Michael Fund respectfully requests Judgment in favor of Michael Fund or, alternatively, in his own favor as follows:

    A.  Compensatory damages against Weiss and Nutmeg in an amount to be determined at trial but no less than $12,000 and punitive damages against Weiss and Nutmeg in an amount to be determined at trial;

.    B.  Costs and attorneys' fees by law;

    C.  Prejudgment interest; and

    D.  Such further relief as the Court deems just under the circumstances.

**Count XVIII**

### Breach of Fiduciary Duty and Legal Malpractice
### (By plaintiff directly and derivatively on behalf of the Funds,
### Against Weiss and
### Nutmeg and Barnes & Thornburg)

374.     Paragraphs 1 - 373 are repeated and realleged as if set forth fully herein.

375.     Weiss willfully and deliberately breached her fiduciary duties to plaintiff

and to the Funds by pursuing the frivolous *Weiss v. Altholtz* lawsuit.

376.     Weiss was grossly negligent and reckless in failing to ascertain that the

claims she filed in the *Weiss v. Altholtz* lawsuit was meritless and untimely.

377.     Weiss had no legal right to expend the Funds' money on attorneys fees in

pursuing the *Weiss v. Altholtz* lawsuit since by failing to notify the limited partners in the

Funds of their right to select a new general partner in accordance with the limited

partnership statute, she wrongfully usurped decision-making authority for herself.

378.     Weiss also breached fiduciary duties by expending money belonging to

the Funds in the *Weiss v. Altholtz* lawsuit because, even if the lawsuit had been

successful, it would have benefitted Nutmeg rather than the Funds.

379.     Plaintiff and the Funds were injured in their business and property by

Weiss' breach of her fiduciary duties as described herein.

380.     Weiss and Barnes & Thornburg specifically owed and undertook a duty to

represent the legal interests of the Funds and plaintiff.

381.     Plaintiff and the Funds could not effectively consent to the actions of

Weiss and Barnes & Thornburg because, by failing to notify the limited partners of their

right to select a new general partner for each Fund, Weiss wrongfully usurped all

decision making authority for herself.

382.    Weiss and Barnes & Thornburg failed to meet the standard of care for

lawyers in the community, committed legal malpractice, and acted recklessly and with

gross negligence in concluding that the claims in the *Weiss v. Altholtz* case were

meritorious.

383.    Alternatively, if the claims in the *Weiss v. Altholtz* case were meritorious,

Weiss and Barnes & Thornburg failed to meet the standard of care for lawyers in the

community, committed legal malpractice and acted recklessly and with gross negligence

in failing to respond to the arguments the defendants made for dismissal, failing to

dispute the defendants' showing that a one-year statute of limitations applied, failing to

show that the suit was brought with diligence sufficient to invoke equitable tolling,

failing to show that a receivership supported equitable tolling, and failing to show that

principles of unjust enrichment supported rather than defeated those claims.

384.    Plaintiff and the Funds were injured in their business and property as a

result of the legal malpractice by Weiss and Barnes & Thornburg.

WHEREFORE, the Plaintiff requests judgment in their favor of the Funds or, alternatively,

in favor of themselves, as follows:

A.    Compensatory damages in an amount to be determined at trial but no less

than $7,500.00 against Weiss and Nutmeg and Barnes & Thornburg and punitive

damages in an amount to be determined at trial against Weiss and Nutmeg;

B.   Costs as allowable by law;

C.   Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

**Count XIX**
**Breach of Fiduciary Duty and Legal Malpractice**
**(Wasting the Funds Assets Pursing Documents**
**Defendants Already Had in Their Possession)**
**(By plaintiff directly and derivatively on behalf of the Funds,**
**Against Weiss and Barnes & Thornburg)**

385.    Paragraphs 1 - 384 are repeated and realleged as if set forth fully herein.

386.    Weiss and Barnes & Thornburg willfully and deliberately breached her fiduciary duties to plaintiff and to the Funds by filing a rule to show cause against Plaintiff on April 9, 2010 (hereinafter, "the April 9, 2010 rule to show cause") which sought to have compel Plaintiff to turnover the Mercury Amendment/Carried Interest documents and have him held in contempt for failing to do so.

387.    Weiss, in fact, had assumed exclusive possession of these Mercury Amendment/Carried Interest documents on September 2, 2012.  Nevertheless, she repeatedly falsely represented to the Court that did not have them and wasted funds by paying herself and Barnes & Thornburg attorneys fees in prosecuting the April 9, 2010 rule to show cause.

388.    Weiss knew, or was at least reckless in failing to ascertain that the Turnover/Contempt motion she was prosecuted against Plaintiff was meritless and a

waste of time since she was already in possession of the Mercury Amendment/Carried
Interest documents.

389.    Weiss also had no legal right to expend the Funds' money on attorneys
fees prosecuting the Turnover/Contempt application against Plaintiff since by failing to
notify the limited partners in the Funds of their right to select a new general partner in
accordance with the limited partnership statute, she wrongfully usurped decision-
making authority for herself.

390.    Weiss also intentionally or recklessly wasted the Funds' assets by paying
Crowe Horwath to analyze and determine the extent of Nutmeg's entitlements from
Mercury based on an assumption that the Mercury partnership agreement had not been
amended to include the carried interest provision.  In fact, and as Weiss knew or should
have known, the Mercury limited partners did in fact adopt the carried interest
amendment.  Crowe Horwath's work on the issue of Nutmeg's entitlements from
Mercury was therefore necessarily incorrect and useless and the fees paid to Crowe
Horwath for this work was a complete waste of the Funds' assets.

391.    Plaintiff and the Funds were injured in their business and property by
Weiss' breach of her fiduciary duties as described herein.

392.    Weiss and Barnes & Thornburg specifically owed and undertook a duty to
represent the legal interests of the Funds and plaintiff.

393.    Plaintiff and the Funds could not effectively consent to the actions of

Weiss and Barnes & Thornburg because, by failing to notify the limited partners of their right to select anew, a general partner for each Fund, Weiss wrongfully usurped all decision making authority for herself.

394.    Weiss and Barnes & Thornburg breached their duty of due care and loyalty, failed to meet the standard of care for lawyers in the community, committed legal malpractice, and acted intentionally, recklessly and/or with gross negligence in pretending that the Mercury Amendment/Carried Interest documents were not in their possession or failing to ascertain that these documents were, in fact, in their possession, in pursuing frivolous motion practice aimed at compelling Plaintiff to turn over the documents, and in providing incorrect information to Crowe Horwath which caused Crowe Horwath to incur fees performing analyses which were useless and based on incorrect assumptions.

395.    Plaintiff and the Funds were injured in their business and property as a result of the legal malpractice and breaches of fiduciary duty committed by Weiss and Barnes & Thornburg.

WHEREFORE, the Plaintiff requests judgment in their favor of the Funds or, alternatively, in favor of themselves, as follows:

A. Compensatory damages in an amount to be determined at trial but no less than $50,000.00 and punitive damages in an amount to be determined at trial against Weiss, Nutmeg and Barnes & Thornburg;

B.  Costs as allowable by law;

C.  Prejudgment interest; and

D.  Such further relief as the Court deems just under the circumstances.

**Count XX**
**Breach of Fiduciary Duty**
**Converting the Gold Coast Note Held By Nutmeg Rather**
**than The Gold Coast Notes Held by the Funds**

**(By Plaintiff as a limited partner in Mercury Fund, Patriot Fund, Fortuna Fund,**
**Michael Fund, October 2005, Lightning Fund, MiniFund and**
**MiniFund II, Against Weiss)**

396.    Paragraphs 1 - 395 are repeated and realleged as if set forth fully herein.

397.    Weiss willfully and deliberately breached her fiduciary duties to plaintiff

and to the Funds by issuing to Gold Coast a notice to convert a portion of the debt that

Gold Coast owed Nutmeg to the exclusion of the conversion of the debt that Gold Coast

owed Mercury Fund, Patriot Fund, Fortuna Fund, Michael Fund, October 2005 Fund,

Lightning Fund, MiniFund and MiniFund II.

398.    For the reasons set forth herein, the conversion notice which Weiss sent to

Gold Coast and which sought conversion of approximately 8.5 percent of the then

issued and outstanding Gold Coast stock precluded Weiss from serving a notice on

behalf of the Funds which sought to obtain any significant amount of Gold Coast stock

until the point in time that Gold Coast elected to honor the conversion notice sent on

behalf of Nutmeg and Nutmeg sold a substantial portion of the resulting stock.

399.    The federal common law interpreting the Investment Advisors Act of 1940,

an investment advisor is not permitted to trade for its own account in the securities in which its customers are invested in a fashion which is detrimental to the value of its customers interests in that stock.

400. Under the Illinois law of fiduciary obligations, a fiduciary cannot deal for his own account with respect to any opportunity or property falling within the trust relationship and in doing so commits either a constructive of actual fraud.

401. By sending a conversion notice to Gold Coast solely on behalf of Nutmeg and to the exclusion of the Funds ability to do so, Weiss violated her own and Nutmeg's fiduciary obligations not to prefer their own interest to those of the Funds and the investors in the Funds.

402. Plaintiff and the Funds were injured in their business and property by Weiss' breach of her fiduciary duties as described herein.

403. Weiss and Barnes & Thornburg specifically owed and undertook a duty to represent the legal interests of the Funds and plaintiff.

404. Plaintiff and the Funds could not effectively consent to the actions of Weiss and Barnes & Thornburg because, by failing to notify the limited partners of their right to select a new general partner for each Fund, Weiss wrongfully usurped all decision making authority for herself.

405. Plaintiff and the Funds were injured in their business and property as a result of the foregoing legal malpractice and breaches of fiduciary duty committed by

Weiss and Nutmeg.

WHEREFORE, Plaintiff requests judgment in their favor of the Funds or, alternatively, in

favor of themselves, and against Weiss, as follows:

A.   Imposition of a constructive trust upon the proceeds of the stock provided by

Gold Coast in response to the conversion notice (whether voluntarily provided by Gold

Coast or under compulsion of a Court order or judgment) and punitive damages in an

amount to be determined at trial against Weiss and Nutmeg.

B.   Costs as allowable by law;

C.    Prejudgment interest; and

D.   Such further relief as the Court deems just under the circumstances.

[The following Count relates to a dismissed claim but is set forth herein for the sake of
convenience and in order to avoid the risk of waiving any right to appeal]
**Count XXI**
**Legal Malpractice, *Respondeat Superior***
**and Aiding and Abetting Legal Malpractice**
**and Breach of Fiduciary Duty**
**(By plaintiff directly and derivatively on behalf of the Funds,**
**Against Weiss**
**and Barnes & Thornburg)**-

406.    Paragraphs 1 - 405 are repeated and realleged as if set forth fully herein.

407.    Weiss and Barnes & Thornburg committed legal malpractice when they

intentionally, recklessly or with gross negligence, overlooked or misinterpreted the

provisions in the Illinois and Minnesota limited partnership statutes which provided that

the order placing Nutmeg in receivership gave a majority of the limited partnership

interests of each Fund the right admit a new general partner for that Fund to replace Nutmeg. Alternatively, Weiss and Barnes & Thornburg committed legal malpractice when they intentionally violated their obligation to inform the limited partners of their right to admit a new general partner for each Fund to replace Nutmeg.

408. Barnes & Thornburg committed legal malpractice when it failed to advise Weiss and Nutmeg of their obligation to inform the limited partners of their respective rights, following the order placing Nutmeg in receivership, to select a new general partner for each Fund.

409. Weiss has apparent authority to act on behalf of Barnes & Thornburg in connection with the Nutmeg receivership.

410. Weiss billed for her time as the Nutmeg receiver through Barnes & Thornburg and the fee applications did not distinguish or separate out Weiss' role as receiver and the role she played as a Barnes & Thornburg attorney who rendered services to Nutmeg and the Funds.

411. Barnes & Thornburg aided and abetted and participated in Weiss' legal malpractice and breach of fiduciary duties.

412. Since Weiss was not a receiver for any of the Funds she necessarily was acting as a lawyer for the Funds when she made decisions on their behalf. WHEREFORE, plaintiff respectfully requests a declaratory judgment that each and every aspect of Weiss' conduct as a receiver was also the practice of law and that Barnes &

Thornburg is liable to the same extent as Weiss for each and every breach by Weiss of

her fiduciary duties and each of Weiss' acts of legal malpractice.

## **JURY DEMAND**

Plaintiff requests a jury trial on all claims so triable.

Dated: May 26, 2015

1333 Sprucewood, Deerfield, IL 60015
(847) 948-5431
Attorney No. 102561